[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

"supposition."—*Baldwin v. The State*, 111 Ala. 15; 1 Mayfield's Dig., 176 §§ 239, 240; *Bones v. The State*, 117 Ala. 138.

Charge 29 is confused and obscure.

Charge 7 should have been given.—*Walker v. The State*, 117 Ala. 42.

The verdict rendered was not a special one, but found "the defendant guilty as charged in the indictment."— *Huffman v. The State*, 89 Ala. 33.

Reversed and remanded.

# Henderson *et al. v.* Hall *et al.*
## and
# Hall *et al. v.* Henderson *et al.*

*Bill in Equity by Judgment Creditor of a Corporation against certain Stockholders to subject alleged unpaid Stock Subscription to the satisfaction of Judgment.*

1. *Bill by judgment creditor of corporation to subject unpaid stock subscription to payment of judgment; when bill fails to show corporation bound by transaction attacked.*—On a bill filed by a judgment creditor of a corporation against certain stockholders therein, to subject alleged unpaid stock subscription to the satisfaction of his judgment, where it is averred, in anticipation of the plea of payment, that the president of the corporation, "pretending to be authorized thereunto, but not having such authority," proposed to defendant stockholders that they pay their subscriptions and he would cancel their obligations in respect thereto and deliver to them certain bonds or other assets of the company to the amount equal to the amount of the subscription paid, or pay them for their stock in funds of the corporation, and this proposition was accepted and executed, on a demurrer to such bill, it can not be considered as averring that the corporation was, in any way, bound by the transaction, or that the allegation of the want of authority referred to the corporation and not to the president thereof.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

2. *Same; when right does not exist; garnishment.*—Where the president of a corporation, acting without authority, proposes to certain subscribers to the capital stock of the corporation, that if they would pay their subscription in cash he would cancel their obligations and transfer to them certain bonds owned by the corporation to an amount equal to their subscription so paid, or pay them for their stock in funds of the corporation, and this proposition is accepted by such subscribers and the plan is carried out, the corporation is not bound by such unauthorized acts of its president and may sue on the subscription notes thus illegally cancelled; and a judgment creditor of the corporation, whose judgment has been returned no property found, has, by virtue of section 2972 of the Code of 1886 then in force (Code, 1896, § 2182), a plain, adequate and complete remedy at law by the process of garnishment, for subjecting the amounts due from such subscribers to the satisfaction of his judgment; and can not maintain a suit in equity to subject the unpaid stock subscriptions to the payment of his judgment.

3. *Jurisdiction of chancery court to reach and subject choses in action.*—The chancery court has no original jurisdiction at the suit of a judgment creditor, to reach and subject choses in action to the payment of a judgment.

4. *Equity jurisdiction; can not subject choses in action of judgment debtor to satisfaction of judgment.*—In the absence of a statute, and where there is no averment of fraud or mistake, or the existence of a trust or some other fact recognized as ground of equitable jurisdiction, a court of equity has no power to subject the choses in action of a judgment debtor, which includes the unpaid subscriptions to the capital stock of a corporation, to the satisfaction of his judgment on which execution has been returned "no property found."

5. *Same; same; can be enforced by garnishment.*—Inasmuch as by statutes authorizing garnishment proceedings, a judgment creditor is given the legal right to levy upon and subject choses in action of his judgment debtor to the payment of the judgment, the right to subject such choses in action to the payment of the judgment can be enforced in equity when, because of some impediment, it can not be enforced by garnishment.

6. *Corporations; assets not a trust fund.*—The assets of a corporation, which includes subscriptions to capital stock of a corporation and debts due it for subscriptions to its capital stock, do not, under any circumstances, constitute a trust fund for the payment of its corporate debts; and, therefore,

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

the jurisdiction of a court of equity to subject debts due a corporation for stock subscriptions to the satisfaction of a judgment against the corporation, can not be rested upon the idea that such choses in action are impressed with a trust.

7. *Bill to subject unpaid subscriptions to payment of judgment, when election does not constitute estoppel.*—Where a respondent to a bill filed by a judgment creditor of a corporation against certain stockholders to subject alleged unpaid stock subscriptions to the payment of a judgment, procures an order requiring the complainants in such bill to elect whether they would further prosecute such a bill or proceed with garnishment proceedings instituted by them against said respondents, at that time pending in a court of law and involving the same matters involved in the bill in the court of equity, and the complainants elect to dismiss the proceedings in garnishment and continue the prosecution of the suit in equity, by compelling such election, the respondents are not estopped to thereafter object to the jurisdiction of the court of equity of the cause as presented in such bi'' nor are the respondents thereby cut off from any defense they would otherwise have had against the suit in equity.

8. *Same; right of assignee to maintain such bill*—The fact that a party seeking by bill in equity to subject unpaid subscriptions to the stock of a judgment debtor corporation to the satisfaction of said judgment is the assignee of the judgment which it is sought to have paid, does not impede his legal remedy by garnishment, so as to give him a standing in a court of equity to maintain such suit; since, under the provisions of the statute, where suits are brought in the name of the person having the legal right for the use of another, the beneficiary is considered the sole party on the record (Code, § 29), and such assignee, could, therefore, obtain the relief in a court of law

9. *Same; when bill not multifarious.*—A bill filed by a judgment creditor of a corporation against various subscribers to the stock of the corporation, to subject their unpaid subscriptions to the satisfaction of his judgment is not multifarious or objectionable for misjoinder of parties respondent, when it is shown by the bill that the rights sought to be asserted by the complainant are the same against each of the respondents and the obligation, if any, of each is the same; and this is true, notwithstanding the interest and obligations of the respondents as among themselves are entirely independent and distinct

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

10. *Equity pleading; when submission of cause includes demurrer.*
On the final submission of a cause on the pleadings and
proof, it is not necessary or even proper that the demurrer
should be set down in the note of testimony; and where there
is a written submission of the cause, which clearly embraces
all questions and issues in the cause, both of law and of fact,
as well on the pleadings as on the evidence, such submis-
sion includes a submission on the demurrers.

11. *Bill by judgment creditor to subject unpaid subscriptions to
capital stock; when can not be maintained.*—On a bill filed
by a judgment creditor of a corporation against certain stock-
holders therein to subject unpaid subscriptions to the capi-
tal stock to the satisfaction of his judgment, where it ap-
pears that the president of the corporation, pretending he
was authorized thereunto, but not having such authority, in
order to induce the payment by the respondents of the over-
due stock subscription notes, offered to purchase the stock of
the subscribers who would pay their notes, and some of the
defendants paid their notes and their stock was purchased
and paid for with the assets of the corporation, the com-
plainant is not entitled to the relief prayed for, but could
maintain an action at law to recover the assets of the cor-
poration so unlawfully disposed of; the corporation and its
creditors having, by the transaction complained of, received
the full benefit of the amount so paid, and having suffered
injury only by an illegal and unauthorized diversion of the
corporate assets in payment of the stock.

12. *Same; same.*—The mere fact that the subscribers to the capital
stock of a corporation, intending to defraud the corporation
and hinder its creditors, sell their stock to a non-resident,
not believing and having no reason to believe that the buyer
was able to perform his promise to pay the subscription notes,
does not confer upon the judgment creditor of said corpora-
tion the right to maintain a bill in equity to compel the
original subscribers to the stock so sold, to pay their sub-
scription notes; such judgment creditor having an adequate
remedy at law by garnishment proceedings.

13. *Bill by judgment creditor to subject unpaid subscriptions to sat-
isfaction of judgment; res adjudicata; garnishment.*—Where
a judgment creditor of a corporation institutes garnishment
proceedings to subject alleged unpaid subscriptions to the cap-
ital stock of the corporation to the satisfaction of his judg-
ment, and the garnishees answer, which answer is contested
and judgment is thereafter rendered discharging the gar-
nishees, in a subsequent suit in equity by the same judgment

[Henderson *et al.* v. hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

creditor, seeking to subject to the satisfaction of his judgment the unpaid subscriptions to the capital stock of said corporation alleged to be due from those persons who were garnishees in the garnishment suit, the proceedings and judgment in the garnishment suit are *res adjudicata* as to complainant's right to recover in the suit in equity; and a plea in the subsequent suit in equity, setting up the adjudication as a bar to the relief prayed for, presents a sufficent defense.

14. *Equity pleading; when cause not at issue; suppression of deposition.*—A party defendant to a bill in equity died before answering, and before the rendition of a decree *pro confesso* against him. An order of revivor was entered against his administrator against whom a decree *pro confesso* was subsequently rendered. This decree *pro confesso* was set aside, and he was allowed to answer. Depositions were taken in the cause after the administrator had been made a party, and before the decree *pro confesso*, and also after the decree had been set aside, and before he answered. *Held*: That these depositions were taken before the cause was at issue, and under Chancery Rule 49 (Code, p. 1211), providing that testimony can not be taken before the cause is at issue, by sufficient answer or decree *pro confesso*, should have been suppressed.

15. *Equity practice; when necessary to make proof of material facts.* Where a bill in equity is filed against several respondents, whose liabilities are separate and distinct as among themselves, material facts denied by any of the respondents should be proved, though such facts may be admitted by most of the respondents.

16. *Amendment.*—An amendment to a bill in equity, alleging facts which would cure a variance between the allegations of the bill and the proof, is material, and should not be stricken out.

17. *Bill by judgment creditor of corporation to subject unpaid subscription to satisfaction of judgment; when cross bill demurrable.*—In a bill by a judgment creditor of a corporation against certain stockholders, to subject their unpaid stock subscriptions to the satisfaction of the judgment, one of the respondents filed a cross bill against a co-respondent, alleging that cross complainant sold a certain amount of stock to cross respondent, the latter agreeing to pay the subscription, and hold cross complainant harmless. It was alleged that the president of the corporation, having authority so to do, consented to the sale, that cross complainant's subscription note was cancelled, and that the cross respondent was, at the time of the sale and is still, financially able to pay the subscription.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

The cross bill prayed that, if complainants recovered against cross complainant, a decree in favor of the latter might be entered against cross respondent for the amount of the stock sold, but there was no allegation that cross respondent had not paid for the stock, or that cross complainant was liable therefor. *Held*: That the cross bill showed no liability on the part of cross respondent, and was demurrable

18 *Bill by judgment creditor of corporation to subject unpaid subscription to satisfaction of judgment; amendment to bill; when should be allowed.*—A judgment creditor of a corporation sued subscribers to the stock to subject their alleged unpaid subscriptions to the satisfaction of his judgment Anticipating a defense of payment, complainant averred that the president of the corporation had without authority induced respondents to pay their subscription notes by buying their stock and paying for it in assets of the corporation. Subsequently, an amendment was added, alleging that some of the respondents had not paid their subscription notes in cash, but had been illegally allowed credit for certain services, some of which were rendered to other corporations. *Held*: That the amendment was material, because the respondents who were illegally allowed credit would be liable for those credits in addition to the amount of the subscriptions for which the other respondents would be liable, if at all.

19. *Bill of judgment creditor of corporation to subject unpaid subscription to satisfaction of judgment; bill for discovery; construction of statute.*—The statute of 1844, which conferred upon a judgment creditor the right to maintain a bill in equity against his judgment debtor to compel the discovery of any property belonging to him, and empowering the chancery court to subject choses in action thereby discovered to the satisfaction of the judgment (Acts of 1844, p. 107; Code of 1886, § 3540; Code of 1896, § 814), confers that jurisdiction only in respect of concealed choses in action, to be exercised only by bills of discovery and proceedings thereunder; and, therefore, such statute does not give a judgment creditor the right to go into a court of equity to subject known choses in action of his judgment debtor to the satisfaction of his judgment.

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. JERE N. WILLIAMS.

The bill in this case was filed by J. L. Hall and L. B. Farley, trustees, as assignees of a judgment recovered by one Hall, as receiver of the Farley National Bank against the Alabama Terminal & Improvement Company.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

Charles Henderson, the Alabama. Terminal & Improvement Company and others were made parties defendant to the bill. The purpose of the bill and the amendments thereof are sufficiently shown in the opinion.

The defendants, Charles Henderson, Jere C. Henderson, Gustavus Hendricks and John S. Carroll and Thomas Murphree, partners using the name of Carroll, Murphree & Co., severally filed a motion in which they averred that at the time of the filing of the bill in this case there was pending in the city court of Montgomery a suit at law by the complainants in this cause against the said defendants to recover of them as stockholders of the Alabama Terminal & Improvement Company the amount claimed to be due from them as such stockholders, as unpaid subscription to the capital stock of said Alabama Terminal & Improvement Company, which said suit pending in the city court of Montgomery was for the same cause of action as that set out in the bill. The said defendants then moved the court to order the complainants in this cause to elect in which of said suits they would proceed, and that they be required to dismiss the others. This motion was granted and the complainants elected to proceed with the present suit and dismissed the suit at law in the city court.

The said defendants, Charles Henderson and others, demurred to the bill, which demurrer was as follows: "1st. That said bill is multifarious in this, that it seeks to enforce a liability against some of the defendants therein, based on contracts, and against other defendants therein based on torts.

"2. That said bill is multifarious in this, it joins separate and distinct causes of action of different natures, in which the several defendants alone are interested, and which call for relief of separate and distinct natures in this: Said bill seeks to recover against the defendants Charles Henderson, Jere C. Henderson, O. C. Wiley and Wiley & Murphree on their several contracts of subscription to the capital stock of the Alabama Terminal & Improvement Company for the amount claimed to be unpaid thereon, and also seeks to recover against

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

defendants Charles Henderson, Jere C. Henderson. O. C. surviving partner of L. & W. J. Henderson, Jas. M. Henderson & Co., Gustavus Hendricks, John S. Carroll and Carroll, Murphree & Co., on account of certain torts averred against them severally by which it is claimed they wrongfully and unlawfuly came into possession of certain bonds issued by the Alabama Midland Railway Company, and which were the property of the Alabama Terminal & Improvement Company, and which it is alleged so came into possession of said several defendants under separate and distinct fraudulent agreements or arrangements between them severally and J. W. Woolfolk, president of the Alabama Terminal & Improvement Company, with which said fraudulent agreements or arrangements it is not shown that the other defendants first herein mentioned had any connection.

"3.   The said defendant Charles Henderson further separately demurs to said bill as amended on the following grounds: 1st.   The said bill seeks to recover against him on an alleged contract of subscription made by him to the capital stock of the Alabama Terminal & Improvement Company, for the amount unpaid thereon; and also seeks to recover certain moneys of the said Alabama Terminal & Improvement Company, alleged to have been wrongfully and unlawfully paid to this defendant by J. W. Woolfolk, president of said company; and also seeks to recover against this defendant on account of an alleged tort, in this, that the said defendant is in the wrongful possession of certain bonds issued by the Alabama Midland Railway Company, and which were the property of the Alabama Terminal & Improvement Company, and alleged to have been wrongfully and fraudulently delivered to this defendant by J. W. Woolfolk, president of said Alabama Terminal & Improvement Company, for which said bonds the said bill seeks a recovery as for a conversion, and the relief sought in respect of said several matters is different and inconsistent.

"4.   The said J. C. Henderson further separately demurs to said bill of complaint as amended, and assigns the following grounds, to-wit: (1.)   That said bill as

amended seeks to recover against this defendant on a contract of subscription made by him to the capital stock of the Alabama Terminal & Improvement Company, on the ground that said subscription is unpaid as alleged in the original bill, and also seeks to recover against this defendant upon an alleged additional subscription to the capital stock of said company made by this defendant as alleged in the bill as amended, which last right of recovery is based upon an alleged fraudulent transfer of said subscription by this defendant from one Baltzell; and said bill as amended further seeks to recover against this defendant on account of an alleged tort, in this, that this defendant is alleged to have wrongfully and fraudulently come into the possession of certain bonds issued by the Alabama Midland Railway Company, which was the property of the Alabama Terminal & Improvement Company, and that such possession was acquired by unlawful and fraudulent agreements made between this defendant and one J. W. Woolfolk as president of said Alabama Terminal & Improvement Company, and the relief sought by said bill against this defendant on account of said several transactions is of different and inconsistent nature. (2.) Said bill is multifarious in this, that it seeks to recover against this defendant on account of the alleged claims and liabilities against him separately, and also against the other defendants named in said bill on account of the several transactions alleged against them, and this defendant is not shown to have had any connection with said last named transaction, nor are the other defendants shown to be connected in any manner with the said transaction alleged in respect to this defendant.

"5. All of the defendants separately and severally further demur to said bill of complaint as amended on the further grounds, to-wit: (1.) It appears from the averments of said bill that the complainants have a full and adequate remedy at law against each of said defendants severally. (2.) The said defendants demur separately to that portion of the bill of complaint as amended as seeks to recover against the defendants on account of

their several alleged contracts of subscription to the capital stock of said Alabama Terminal & Improvement Company, on the ground that it appears from the averments of said bill that complainants have a full, complete and adequate remedy at law against each of said defendants severally.

"6. Said defendants further severally demur to said bill of complaint as amended on the following ground, to-wit: There is a misjoinder of parties defendant in this, that the cause of action alleged against each defendant separately is one in which neither of the other defendants has any connection or interest."

The defendants Oliver C. Wiley and Wiley & Murphree each filed the following pleas: "These defendants, further answering say and aver by way of plea as well as answer to the bill of complaint filed in this cause, that complainants ought not to further prosecute this action, for that, to-wit, during the year 1893, these complainants commenced a suit, by process of garnishment, in the city court of Montgomery, Alabama, against these defendants, respectively, involving the very matter and things embraced in this present bill of complaint, now pending in this honorable court, to-wit: involving the very question as to whether or not the said Oliver C. Wiley and the firm of Wiley & Murphree, a partnership composed of Oliver C. Wiley and Clarence Murphree, were indebted to the Alabama Terminal & Improvement Company by reason of their having executed certain subscription notes to the capital stock of the said The Alabama Terminal & Improvement Company; and these defendants aver that the indebtedness thus sought to be established in said suit, in the said city court of Montgomery, is the very liability now sought to be enforced in said bill against these defendants, if in fact any such liability exists for unpaid subscriptions to the capital stock of the said The Alabama Terminal & Improvement Company; that at the fall term, 1893, of said city court of Montgomery, these defendants filed a written answer, under oath to the writ of garnishment in said suit, in said city court of Montgomery, a copy of which answer is hereto attached, and marked Exhibit No. 1, and asked

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

to be deemed and taken as a part of this plea; that upon the filing of said answer (Exhibit No. 1) plaintiffs in said suit (complainants here) objected to said answer upon the ground that the same was not sufficiently full and explicit; and, thereupon, at the same term of the city court of Montgomery, these defendants filed two other answers under oath in said suit, copies of which are hereto attached marked Exhibit No. 2, and Exhibit No. 3, and asked to be deemed and taken as a part of this plea; that, thereupon, at a subsequent term of the said city court of Montgomery, these defendants, to-wit, O. C. Wiley and the said Wiley & Murphree were by the judgment of said city court duly and legally discharged upon their sworn answers as aforesaid, and were allowed to go hence; that all of this occurred prior to the filing of the bill of complaint in the present suit in this honorable chancery court; and these defendants now aver and plead that the question of liability now sought to be enforced in this present bill of complaint against these defendants for and on account of certain notes given by them, respectively, to the capital stock of the said The Alabama Terminal & Improvement Company, is the same matter and thing which was set forth, embraced and involved in said former suit in said city court of Montgomery; that these complainants in said former suit in the city court of Montgomery impleaded these defendants in a court of competent jurisdiction upon the same cause of action, disclosing the same question of claim embraced in the present action that the said city court of Montgomery had jurisdiction of the parties and of the subject matter, and rendered a final judgment upon the merits of the case in said former suit, in favor of these defendants, and against these complainants, who were plaintiffs in said former suit; that said judgment of said city court of Montgomery was never appealed from and remains until this day unreversed and in full force and effect. And these defendants jointly and severally plead said judgment in said former suit in said city court of Montgomery in bar to the present action."

30c

[Henderson *et al.* v. Hall *et. al.*, and Hall *et al.* .v. Henderson *et al.*]

. The defendants, J. M. Henderson & Co. and J. M. Henderson as an individual, filed their joint and several answers, in which they denied their alleged indebtedness to the said bank, and averred as follows: "That at the time of the matters and things complained of in the 20th and 21st paragraphs of the bill the Alabama Terminal & Improvement Company was not indebted to said Farley National Bank, and they aver that the debt upon which said judgment is founded (if in fact any such debt exists, which they deny,) was created after the time when it is alleged the matters and things occurred set forth in said 20th and 21st paragraphs; and these respondents aver that if there were any such transactions as are set out in said 20th and 21st paragraphs (but as to these respondents there were never such, as will more fully appear hereinafter), then they aver that said Farley National Bank had full and legal notice of the same at the time their said debt was thereafter created, if it ever was created, and these respondents further aver that said bank was dealing with said Alabama Terminal & Improvement Company at the time of said transactions set up in said 20th and 21st paragraphs, and knowingly participated in, and received benefits from, said pretended illegal transactions. After such knowledge and participation said bank now has no right to complain, and is estopped from setting up said pretended illegal transactions, as a creditor of said Alabama Terminal & Improvement Company; they being subsequent creditors.

"3d. Respondents deny each and every averment contained in the 20th and 21st paragraphs of said bill, and especially those relating solely to these respondents. They aver that they fully paid off and discharged twenty-five hundred dollars of their subscription to said A. T. & I. Co., and stock to that amount was issued to them, which stock thew now hold and own. As to the remaining five thousand dollars, they aver that in the month of January, 1890, these respondents sold to J. C. Henderson, a co-respondent to the original bill in this case, $5,000 of the stock so subscribed by them to said company, and said J. C. Henderson executed and

delivered to these respondents his written obligation by which in consideration of $5,000 of the stock so subscribed by these respondents, which was to be issued to him, he agreed to pay or satisfy $5,000 of their said subscription, and to hold them harmless against any claim that said company set up on account of said subscription to the amount of $5,000. Said company was immediately notified of said sale of stock to said J. C. Henderson, and of said agreement, and that then and there the said J. W. Woolfolk, who was president of said company, and business manager of same, agreed to look to and hold said J. C. Henderson bound and liable for said sum and to discharge and release these respondents from all liability on account of same. And these respondents aver that said Woolfolk, as such president and business manager, had full control and management of, and transacted all the business of said company, and was given all the authority and power to do so that the board of directors could lawfully give and delegate to him, and under this power and authority he had the power and authority and did bind said company by his agreement as above alleged.

"4th. That the said J. C. Henderson was at the time of said agreement, and is now, solvent and financially strong, and is amply able to pay said $5,000.

"5th. That the said J. C. Henderson after making said agreement to pay off and discharge said $5,000, came to this respondent and delivered to him his said note, which had been in the possession of the said A. T. & I. Co., and respondent turned over to him (the said J. C. Henderson) the agreement which the said J. C. Henderson had made in writing to pay off said $5,000. And respondents aver that these facts caused the said respondents to believe that the said J. C. Henderson had paid said $5,000."

These respondents then prayed that their answer be taken and made a cross bill and that J. C. Henderson be made a party respondent thereto.

The prayer of said cross bill was as follows: "That on the final hearing of this case may it please the court, in the event that it shall be determined that said J. C.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

Henderson.has not paid the said sum of $5,000 which he agreed to pay for these respondents, and these respondents are liable for the same, to enter a decree in favor of respondents against the said J. C. Henderson, for the said sum of $5,000, together with the interest thereon from the time of said agreement. Respondents pray for such other, further, general or special relief as to the court may seem meet and proper in the premises; and as in duty bound," etc.

The respondent, J. C. Henderson, moved the court to strike from the file the cross bill of J. M. Henderson and J. M. Henderson & Co. upon the following grounds: "1st. Because said cross bill purports to seek or pray for relief against this respondent alone, and the said cross bill is embodied in his answer to the original bill of complaint and not filed separately against this respondent. 2d. Because said cross bill was not filed at the time or prior to the date of the submission of the above styled cause and is now improperly filed in said cause. 3d. Because said cross bill prays for relief only as against this respondent, and the complainants in the original bill of complaint are not made parties respondents to said cross bill and no relief is prayed for as against the complainants in said cause and no answer is required of the complainants in said cause to said cross bill. 4th. Because said cross bill has never been legally filed in said cause but was filed without any order of court allowing the same and without the consent of this respondent. 5th. Because there is no equity in said cross bill, in this, that it does not make the original complaint in said cause parties respondent to the cross bill and does not pray for any relief against them, but only seeks a judgment against this respondent in favor of the said J. M. Henderson & Co. upon a demand for which complainants in said cross bill have a plain, full and adequate remedy at law."

This motion to dismiss said cross bill was overruled. Thereupon the defendant J. C. Henderson demurred to said cross bill, among others, upon the following grounds: 1. It appears in and by said cross bill that the complainants therein have been duly and legally

discharged and released from their subscription for said
five thousand dollars of the capital stock of said Ala-
bama Terminal & Improvement Company, and their said
note for five thousand dollars given therefor.   2.   It is
not averred in said cross bill that the said J. C. Hender-
son has not paid said note for five thousand dollars.   3.
It is not averred in said cross bill that the said J. C.
Henderson has not paid, or satisfied, five thousand dol-
lars of complainant's said subscription to seventy-five
hundred dollars of the capital stock of said Alabama
Terminal & Improvement Company.   4. It is not averred
in said cross bill that the said J. C. Henderson has failed
in any respect to perform his alleged written agree-
ment with complainant in said cross bill.   It appears
from said cross bill that this defendant has fully per-
formed said alleged written agreement.   6.   Said cross
bill shows that the complainant therein is in no manner
indebted to, or liable to, the said Alabama Terminal &
Improvement Company, or to complainants in the orig-
inal bill in respect of the matters set forth in said cross
bill.   These grounds of demurrer were sustained.

The defendants Charles Henderson, J. C. Henderson,
J. D. Henderson, as administrator of the estate of L.
Henderson, deceased, surviving partner of L. & W. J.
Henderson, G. Hendricks, John S. Carroll, Carroll,
Murphree & Co., O. C. Wiley and Wiley & Murphree,
separately moved the court to suppress the depositions
of George B. Shellhorn, J. W. Woolfolk, Beverly Chew,
C. M. Chessup, E. B. Joseph, A. St. C. Tennille, J. L.
Hall, L. B. Farley and S. Roman, upon the grounds that
at the time of the demands for the examination of said
witnesses and at the time of the filing of the interrogator-
ies on behalf of the complainants to said witnesses, the
cause was not properly at issue in this:   "That one of
the original defendants to said cause, to-wit, J. L. Hen-
derson, as surviving partner of the late firm of L. &
W. J. Henderson, died on to-wit, the 24th day of Febru-
ary, 1895, and thereafter, to-wit on the 23d day of May,
1895, a summons was issued to J. D. Henderson,
as administrator of the estate of LaFayette Henderson,
deceased, requiring him to appear and defend said
cause as such administrator, which summons was served

on the said J. D. Henderson on, to-wit, the 27th day of May, 1895, and thereafter, on the 26th day of August, 1895, to-wit, within less than six months from the date of the appointment of the said J. D. Henderson as administrator of the estate of LaFayette Henderson, as administrator of the estate of the said L. Henderson, a decree *pro confesso* was entered in said, cause against the said J.D. Henderson, as such administrator, and at the time said demand for the oral examination of said witness was filed and the commissian thereon issued, no answer had been filed by the said J. D. Henderson, as such administrator," and further because the depositions were prematurely taken as against said defendants. This motion to suppress said depositions was overruled.

Subsequently the bill was amended by adding thereto at the end of the bill and just before the prayer, what was known as the "red ink amendment," and which was in words and figures as follows: "And the complainants further aver that the said several defendants herein have been improperly, illegally and fraudulently paid or allowed out of the assets of said Alabama Terminal & Improvement Company by the said J. W. Woolfolk in closing the accounts of the said several parties with said Alabama Terminal & Improvement Company, large sums of money for brokerage or commissions for endorsing the paper of said Alabama Terminal & Improvement Company and for salaries of other corporations and for other items and matters shown in the accounts of the said several parties with said Alabama Terminal & Improvement Company on the books of said last mentioned company, for all of which they are severally liable to account to complainants as creditors of said Alabama Terminal & Improvement Company, and complainants aver that all of such payments and allowances were secret in their nature and unknown to complainants and were never discovered except by the disclosures in the depositions taken in this case." There was a motion made by the defendants to strike this amendment from the bill. The other facts of the case are sufficiently stated in the opinion.

On the final submission of the cause on the pleadings and proof, the chancelor rendered a decree, which was as follows: "It is ordered, adjudged and decreed: First. That the amendment to the bill filed on the 23d day of July, 1897, and described as the 'red ink amendment,' be and the same is hereby stricken from the bill and held for naught. Second. That the pleas interposed by O. C. Wiley and Wiley & Murphree are insufficient in law to constitute any defense to this suit, and are held for naught. Third. That the demurrers interposed to the bill in behalf of the several defendants filed prior to the filing of the said amendment known as the 'red ink amendment,' are not well taken, and the same are hereby in all things overruled. Fourth. It is further ordered, adjudged and decreed that the complainants are entitled to the relief prayed for in their bill of complaint, except as to the claim against J. C. Henderson, set out and alleged in the amendment to the original bill of complaint allowed and filed on the 8th day of October 1895, which said claim, set up and alleged in said amendment, it is ordered, adjudged and decreed and is hereby disallowed. Fifth. It is further ordered, adjudged and decreed that it be and is hereby referred to the register to hold a reference, and ascertain and report." There then follows directions for holding the reference.

From this decree the respondents appeal and assign the rendition thereof as error. The complainants prosecute a cross appeal and assign as eror that portion of the decree of the court striking from the bill what was known as the "red ink amendment," and further that the court erred "in not directing that the several defendants receiving bonds and assets of the insolvent Alabama Terminal & Improvement Company, as alleged in the bill and in said amendment mentioned in the first assignment of error, and, as shown in the evidence, without any legal or valuable consideration as to these appellants as creditors of said corporation, should be held liable to account for the same as assets of said corporation to be applied to appellants' judgment, and this assignment is made also separately and severally as to each of the defendants below, except J. W. Woolfolk, A. C. Saportas, and Farley National bank."

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

R. L. HARMON, W. S. THORINGTON and HARMON, DENT & WEIL, for J. C. Henderson, Charles Henderson, J. D. Henderson, as administrator of L. Henderson, and T. K. Brantley & Sons.—1. The bill as filed seeks to recover a decree against the respondents for the amounts alleged to be due on their subscription notes to the Alabama Terminal & Improvement Company. The demurrers to these respondents raise the question that the complainants have a plain and adequate remedy at law, by garnishment, and this demurrer should have been sustained.— *Allen v. Montgomery R. R. Co.*, 11 Ala. 437; Code of 1886, §§ 2971-2976, inclusive; *Curry v. Woodward*, 53 Ala. 377; *Woolridge v. Holmes*, 78 Ala. 568; *Lehman, Durr & Co. v. Clark*, 85 Ala. 109; *Teague v. LeGrand*, 85 Ala. 492; *Davis Brothers v. Montgomery Furnace & Chemical Co.*, 101 Ala. 127. The act passed in 1895 (Acts, 1894-1895, p. 881) became a law after this bill was filed, and the law expressly excepts from its operation suits pending at the time of its passage. It can have no application to the case at bar.

The chancery court has no original jurisdiction to reach and subject, at the suit of a judgment creditor, the choses in action of the debtor to the payment of the judgment.—*Donovan v. Finn*, 1 Hop. Ch. 59; 14 Am. Dec. 531; *Greene v. Keens*, 14 R. I. 388; 51 Am. Rep. 400; *Shaw v. Aveline*, 5 Ind. 380; *McFerrin v. Jones*, 2 Little (Ky.) 219; *Doyle v. Sleeper*, 1 Dana (Ky.) 534. Choses in action were not subject to levy and sale at common law, and could not be reached and subjected to the payment of a debt by a bill in the chancery court, in the absence of any statute on the subject. The only power of any court, either at law or in equity, in ordinary cases to reach and subject choses in action, is dependent upon the jurisdiction conferred by the statutes on the subject.

The bill in the case at bar was filed March 17, 1894, and it is clear from the allegations of the bill that the pleader proceeded upon the idea that subscriptions to the capital stock of a corporation, and its assets, upon the corporation becoming insolvent, constituted a trust fund for the benefit of creditors, so that a court of equity

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

had jurisdiction to administer the trust, and collect the subscriptions as trust property independent of the statute conferring a remedy at law, by garnishment. At the time the bill in this case was filed, the so-called "American Doctrine" or "Trust Fund Doctrine" was supposed to prevail in this State.—*Goodyear Rubber Co. v. Scott & Co.*, 96 Ala. 459; *Gibson v. Trowbridge Furniture Co.*, 96 Ala. 357; *Corey v. Wadsworth*, 99 Ala. 68.

The cases last above cited were expressly overruled, and this so-called "American Doctrine" or "Trust Fund Doctrine" entirely exploded and denied in the case of *O'Bear Jewelry Co. v. Volfer & Co.*, 106 Ala. 205. It is now the settled law in this State that a corporatoin, whether solvent or insolvent, holds and owns its assets, including subscriptions to its capital stock and choses in action of every character, in the same capacity and to the same extent, so far as the rights of creditors are concerned, as an individual, under similar conditions and circumstances.

2. The fact that complainants are assignees of a judgment does not make their title equitable in such sense as to confer jurisdiction on the chancery court.—*Grangers L. & H. Ins. Co. v. Kemper*, 73 Ala. 346; *Haywood v. Andrews*, 106 U. S. 872; *Farmers and Merchants' Bank v Hall and Farley, trustees*, 24 So. Rep. 347; 120 Ala. 14; 26 So. Rep. 1031; 122 Ala. 668.

3 No such fraud is alleged in the bill as will confer jurisdiction on the chancery court.—*Knotts v. Tarver*, 8 Ala. 743; *Sadler v. Robinson*, 2 Stewart 522; *Dickinson v. Lewis*, 34 Ala. 638; *Smith's Executor v. Cockrell*, 66 Ala. 77; *Youngblood v. Youngblood*, 54 Ala. 486. While on demurrer the bill of complaint must be taken as true, it is also a well settled rule that on demurrer to a bill, the allegations thereof must be construed most strongly against the pleader.—6 Ency. Pl. & Pr., 411; *Lucas v. Oliver*, 34 Ala. 626. In *Cockrell v. Gurley*, 26 Ala. 405, it is held: "The court can not, in aid of the bill, presume the existing of material facts not averred."

4. Where an estoppel is relied on as a basis of jurisdiction, or for any other purpose, the facts constituting the estoppel must be clearly and specifically set out

[Henderson *et al.* v. Hall *et· al.*, and Hall *et al.* v. Henderson *·et al.*]

in, the bill.—*New Albany &·.S. R. Co. v. Fields,* 10 Ind.
187; *Barrington v. Pittsburg S. &· R. Co.,* 34 Pa. 358;
*Swarwout v. Michigan A. L. R. Co.,* 24 Mich. 404.

5.    It is insisted that respondents are estopped from
insisting upon their demurrer, or denying the jurisdiction of the chancery court, in this case, because some of
them made a motion in the city court of Montgomery to
require complainants to elect whether they would proceed to prosecute the garnishment suits, commenced in
that court, prior to the filing of this bill, or whether they
would proceed to prosecute this suit in the chancery
court. The complainants being required by the court to
elect, chose to dismiss their garnishment suits, and prosecute this cause.

There is nothing in this contention.—Rule of Practice
in the Chancery Court, No. 114, page 1227 of the Code
of 1896; *Ex parte Sterns and wife,* 14 Ala. 397; *Foster v. Napier,* 73 Ala. 606; Code of 1896, § 706.

6.    Complainants failed to prove the allegations of
the bill as to the discharge of H. M. Hall, Jr., as receiver
of the Farley National Bank, and the surrender of the
judgment and assets of the bank to it. These allegations
were material and were denied by some of the respondents.—*In re Chitwood,* 165 U. S. 443; *Gibson v. Peters,*
150 U. S. 342. The bill alleged the transfer of the judgment by the Farley National Bank to complainants. No
proof of this fact was made, and complainants, for this
reason are not entitled to recover; the fact of the transfer being denied by these respondents.—*Johnson v.
Martin,* 54 Ala. 272; *Lovins v. Humphries,* 67 Ala. 442;
*Bunnell v. McGee,* 9 Ala. 433. The material allegations
of the bill, or allegations descriptive of that which is material, must be proved as alleged.—*Gilmer v. Wallace,*
75 Ala. 220; *Railroad Co. v. Lancaster,* 62 Ala. 555;
*Goldsby v. Goldsby,* 67 Ala. 562; *Cockrell v. Gurley,*
26 Ala. 405; *Floyd v. Ritter,* 56 Ala. 356; *Meadors v.
Askew,* 56 Ala. 584; *Alexander v. Taylor,* 56 Ala. 63.
The complainants having failed to prove their case, as
alleged in the bill, this court should render such decree
as the lower court should have rendered, dismissing the
bill peremptorily, or without prejudice, without remand-

ing the cause.—*Gilmer v. Morris*, 80 Ala. 89; *Greer v. Campbell*, 21 Ala. 327, 333.

7. The motion to suppress the depositions of complainants' witnesses should have been sustained, because these depositions were taken at a time when the cause was not at issue, as to respondent J. D. Henderson, administrator of L. Henderson, surviving partner of L. & W. J. Henderson. The cause not being at issue as to one of the respondents, it was not at issue as to any of them, so that testimony could be taken.—Rule 49 Chan. Prac., p. 1211 of the Code of 1896; *National Fertilizer Company v. Holland*, 107 Ala. 416.

8. The demurrer of J. C. Henderson to the cross bill filed by respondents J. M. Henderson & Company was properly sustained. A cross bill cannot be sustained on demurrer unless it shows affirmatively a liability on the part of the defendant therein. The cross bill must also be consistent with the answer.—*Hatchet v. Blanton*, 72 Ala. 423; *Graham v. Tankersley*, 15 Ala. 634; *Dill v. Shahan*, 25 Ala. 703; 5 Ency. Pl. & Pr., 645.

9. The proof shows without dispute that these respondents have paid their subscription notes in full in money, except some small amounts allowed to them severally as brokerage or commissions for endorsing the company's paper. The contract between the defendants and the company by which it was to pay stipulated sums to the defendants in consideration of their endorsing notes or paper for it, constitutes a valid contract. It is a legal and valuable consideration where one person agrees to pay another a stipulated price for the loan of his credit as for an endorsement where the endorser incurs a liability and thereby guarantees the payment of the money, as was done in this case.—*Drydock Bank v. American Life Ins. Co.*, 3 N. Y. 356; *Stratton v. Hill*, 134 Mass. 27; *Rutledge v. Townsend*, 38 Ala. 717; *Long v. Ga. Pac. R. R. Co.*, 91 Ala. 519. At most this contract could only be held voidable. A corporation may contract with its directors, and even prefer them in those States where the assets of the corporation are not held to be a trust fund.—*Schufeldt v. Smith*, 39 S. W. Rep. (Mo.) 1039; *Foster v. Mill Company*, 92 Mo.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

87; *Brown v. Furniture Company,* 54 Fed. Rep. 286; *Sanford F. & T. Co. v. Howe,* 157 U. S. 312; *Bank v. D. B. & G. Co.,* 42 N. E. Rep. (Ind.) 42; *Charles v. Dubose,* 29 Ala. 367; *Hallam v. I. H. Company,* 56 Iowa 178; *Holt v. Bennett,* 146 Mass. 437; *Hunt v. Memphis G. L. Company,* (Tenn.) 31 S. E. Rep. 1006. The allowance of these credits on the settlement of the notes for which the Alabama Terminal & Improvement Company was liable by the terms of its contract made the transaction in form an executed contract, or an executed sell-off between the parties and will not now be disturbed.—*Long v. Ga. Pac. Ry. Co.,* 91 Ala. 519; *Allen v. Councilmen of Lafayette Company,* 89 Ala. 641. *len v. Councilmen of LaFayette,* 89 Ala. 641. Although the subscription notes were payable in money if the corporation was indebted to the defendants it was neither illegal or fraudulent as to creditors or any one else for it to allow them credit on their subscription notes for the several amounts that the corporation owed to them, as was expressly decided in *Goodwin v. McGhee,* 15 Ala. 232, 249. See 4 Thompson on Corporations, § 3792; *Washington Savings Bank v. B. D. Bank,* 130 Mo. 155; Cook on Corporations, § 225, par. "B."

10. If the court committed any error in sustaining the motion to strike the "Red Ink Amendment" it was without injury, because the bill, as amended, by the "Red Ink Amendment" was without equity, and subject to demurrer upon the ground that complainants had a plain and adequate remedy at law.—*Tutwiler v. Atkins,* 106 Ala. 194.

11. It is well settled by the authorities in England and in this country that, at common law, choses in action were not subject to levy and sale, and could not be subjected by a creditor to the payment of a debt. It is also well settled by the authorities, both in England and the United States, that the high court of chancery in England had no original jurisdiction or power to reach and subject choses in action to the payment of a debt. What is said in the case of *Hadden v. Spader,* 5 Johnson's Ch. 280, s. c. 20 Johnson 554, on this point, is held to be *dictum* and expressly overruled by the court

of errors of New York, in the case of *Durant v. Albany County*, 26 Wend. (N. Y.) 87. The question decided in *Donovan v. Finn*, 1 Hopk. Ch. 59; 14 Am. Dec. 531, was directly presented to and decided by the court of errors of New York for the first and only time in this case of *Durant v. Albany County*, 26 Wend. 87, and the rule announced in *Donovan v. Finn* was approved and followed, and the principle extended beyond what was decided by Chancellor Sandford. The question that the chancery court has no original jurisdiction or power to reach and subject choses in action to the payment of a debt is well settled by the English decisions.—*Dundas v. Dutens*, 1 Ves. Jr. 196, 197; *Anglo-Italian Bank v. Davies*, 9 Ch. Div. 275; *Holmes v. Millage*, 1 Q. B. 551; 10 English Ruling Cases, 604, 608; *Salt v. Cooper*, 16 Ch. Div. 544; *Wills v. Luff*, 38 Ch. Div. 197; *In re Sheppard*, 43 Ch. Div. 131; *McCarthy v. Goold*, 1 Ball & B. 387, 389; *Grogan v. Cook*, 2 Ball & B. 230; *Nantes v. Corrock*, 9 Ves. Jr. 182; *Rider v. Kidder*, 10 Ves. Jr. 360; *Bank of England v. Lunn*, 15 Ves. Jr. 569. See also the English cases cited in *Durant v. Albany County*, 26 Wend. (N. Y.), 87-108, inclusive. The principle that the chancery court has no jurisdiction or power, in the absence of statutes on the subject, to reach and subject choses in action of a debtor to the payment of a debt, at the suit of a creditor, has been expressly decided in the following well considered cases, where the question was directly presented, so that a decision of the point was necessary for a disposition of the case: New York, in *Durant v. Albany County*, 26 Wend. (N. Y.) 87-108; Maryland, in *Harper v. Clayton* 84 Md. 346; 57 Am. St. Rep. 407, decided December 3, 1896; Rhode Island, in *Green v. Keen*, 14 R. I. 388; 51 Am. Rep. 400; Indiana, in *Shaw v. Aveline*, 5 Ind. 380, and several later cases; New Jersey, in *Disborough v. Outcault, et al.*, 1 N. J. Eq. 306-312; *Hardinburgh v. Blair*, 30 N. J. Eq. 645; *Whitney v. Rollins*, 17 N. J. Eq. 360; *Halstead v. Davidson*, 10 N. J. Eq. 290; *Vandeveer v. Striker*, 8 N. J. Eq. 175; Tennesse, in *Erwin v Oldham*, 6 Yerger (Tenn.) 185; *Creswell v. Smith*, 2 Tenn. 416; 8 Lea (Tenn.) 688;

*Webb v. Jones,* 13 Lea (Tenn.) 200; Kentucky, in *Buford v. Buford,* 1 Bibb (Ky.) 305; *Curd v. Letcher,* 3 J. J. Marsh (Ky.) 443.

11. The act of January, 1844, as originally passed, was unconstitutional, especially, if that act be construed by the court to authorize the filing and maintaining of the bill in a case where no discovery was necessary, in so far as it provided for making "any other person or persons" parties defendant with a judgment debtor, and required them to litigate with the plaintiff in execution, the question of indebtedness *vel non;* or liability, to the execution debtor, on a legal claim, or demand; for the reason that such person, or persons, are, without any wrongful act on their part, deprived of the right of a trial by jury on a purely legal claim or demand. Article I, section 12, Constitution of Alabama of 1875, provides, "That the right of trial by jury shall remain inviolate." This provision as to the trial by jury has been incorporated in each constitution adopted by the people of Alabama, and was in force in January, 1844. See *Wammack v. Holloway,* 2 Ala. 31, 33; *State v. Burnette,* 2 Ala. 140, 143. Although the chancellor might, in his discretion, direct matters of fact to be submitted to the jury, the chancery court would not be bound by their verdict; the verdict would be merely advisory, and could be ignored by the chancery court.—*Matthews v. Forniss,* 91 Ala. 157, 162; *Rice v. Tobias,* 83 Ala. 348, 350; 3 Am. & Eng. Ency. Law (1st ed.), 719-722; *Wiggins v. Williams,* 139 Fla. 637; 18 So. Rep. 859; *Norris Appeal,* 64 Penn. St. 275; *N. Penn. Coal Co. v. Snowden,* 42 Penn. St. 488; 82 Am. Dec. 530; *Haine's Appeal,* 73 Penn. St. 172; *Donahue v. Meister,* 88 Cal. 121; 22 Am. St. Rep. 283; *Phil. F. Ins. Co. v. Cent. Nat. Bank,* 1 Ill. App. 359; *Scott v. Neely,* 140 U. S. 106; Book 35 L. Ed. 358; Sedg. on Sta. Cons. (2d ed.) 479.

12. The act of January, 1844, as codified, in the Code of 1852 was materially changed. The original act provided that the bill might be filed against the judgment debtor and "any other person or persons" to compel the discovery of any property, "money or thing in action," belonging to the defendant and subject to the

payment of a judgment, "whether the same were origi-
nally liable on execution at law or not," while as codi-
fied, section 814 of the Code of 1896, the bill may only
be filed against the judgment debtor to compel the dis-
covery of any property, etc. The words, "and any
other person or persons" and the words "whether the
same were originally liable on execution at law or not"
as contained in the original act being omitted. It is
clear that section 814 of the Code of 1896 confers juris-
diction on the chancery court only in a case where the
bill is filed for a discovery of property which is alleged
to belong to the debtor, but which is concealed or hid
out, so that it cannot be reached by the creditor. The
bill must show that there is property belonging to the
debtor, and show a necessity for a discovery of same,
in order to confer jurisdiction on the court, and these
jurisdictional facts must be proved. It is clear that sec-
tion 814 of the Code of 1896 enlarges the original juris-
diction of the chancery court, and it is a sound general
rule of construction that where a statute creates a new,
or enlarges an existing jurisdiction, the court exercising
such new and enlarged jurisdiction should be held
strictly to the jurisdiction authorized by the statute.
*Durant v. Albany County*, 26 Wend. (N. Y.) 105; *Wil-
liams v. Stoutz*, 92 Ala. 516, 518; *Lawson v. Warren*,
89 Ala. 584; *McCullough v. Jones*, 91 Ala. 186.

13. In Alabama the legislature in and prior
to 1841 provided a remedy by garnishment for
reaching and subjecting the choses in action of
a debtor to the payment of his debts.—*Bingham
v. Rushing*, 5 Ala. 403, 405. This remedy by
garnishment was in force at the time of the passage of
the act of 1844, and at the time of the adoption of the
Code of 1852. See sections 2471, 2472, Code of 1852; sec-
tions 2172, 2182, Code of 1896. The right and remedy
afforded a creditor by the garnishment statutes was a
new right, or one which did not exist at common law,
and the remedy provided by statute for enforcing this
right was exclusive.—*Askew v. Myrick*, 54 Ala. 30, 32;
*Simmons v. Bull*, 21 Ala. 501; *Durant v. Albany County*,
26 Wend. (N. Y.) 87.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

JOHN T. ASHCRAFT and LOMAX, CRUM & WEIL, for J. D. Hendrix.—1. The object of the bill, as gathered from its prayers, is to require the defendants to pay, for the benefit of the complainants, certain subscriptions to the stock of the Alabama Terminal & Improvement Company—the enforcement of a contract. While there is also a prayer for general relief, in its present conjunctive form, the specific relief prayed only can be granted. *Graham v. Cook,* 48 Ala. 103; *Ex parte Branch,* 53 Ala. 140; *Pollak v. Muscogee, etc.,* 102 Ala. 467.

2. The complainants have an adequate remedy at law.—*Allen v. Montgomery, etc.,* 11 Ala. 449; Code of Alabama, § 2182.

3. There can be no complaint by others, when the stockholders themselves acquiesce in the disregard of formalities prescribed for their benefit alone.—*Nelson v. Hubbard,* 96 Ala. 253.

4. Complainants are estopped from denying the payment by Hendrix of his subscription note.—*First Nat. Bank v. Gustin, etc.,* 6 L. R. A. 667; *Bank of Ft. Madison v. Allen,* 129 U. S. 372; *Parsons v. Joseph,* 8 So. Rep. 788.

5. If Hendrix is entitled to have the actual amount received by the Alabama Terminal & Improvement Company from Hoadly & Co. applied to his subscription note then the proof, in the absence of any denial in the pleadings, is sufficient, (a) to show that the Alabama Terminal & Improvement Company received from Hendrix, amount equal to the balance due by him, or (b) to at least shift the burden of proof from Hendrix to complainant.—*Davis v. Montgomery, etc., supra.; Semple v. Glenn,* 91 Ala. 245; *Commonwealth v. Boston, etc.,* 142 Mass. 146; *City Bank v. Bruce,* 17 N. Y. 507; *Rogers v. Phelps* 9 N. Y. Sup. 886; *Elliott v Sibley,* 13 So. Rep. 500; *Dufee v. Boston Water Co.,* 114 Mass. 37 (43).

6. The balance due on the judgment under which complainants claim, at the time of the filing of the bill, constituted no part of the liability of the Alabama Terminal & Improvement Company to the Farley National Bank at the time of the transaction complained of

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

between Hendrix and the Alabama Terminal & Improvement Company. Hendrix, in good faith, after reasonable diligence, believed the corporation to be solvent, and there was no actual fraud in the transaction. There was therefore, no injury to complainants of which they can complain.—*Payne v. Bullard,* 23 Miss. 88; *Glenn v. Hatchett,* 91 Ala. 318; *Pearson v. McCurdy,* 40 S. C. Rep. N. Y. 520; 3 Waite's Actions and Defenses, 442.

W. N. CARLISLE, for T. K. Brantley & Son

GUNTER & GUNTER, WATTS, TROY & CAFFEY and J. M. CHILTON, for Hall & Farley, trustees, etc.—The jurisdiction of the chancery court to furnish a remedy to a judgment creditor with a return of "no property found" against the debtor, rests, in this State, first, upon the original powers of the chancery court to furnish a remedy for every right recognized by the municipal law for which there is not in the courts of the common law a plain, adequate and complete remedy; and, second, upon an unbroken line of decisions approving this jurisdiction since the State was organized; and, third, upon two statutes affirming and confirming this jurisdiction. The statutes referred to are clause 1 of section 633 of the Code in these words: "The powers and jurisdiction of courts of chancery extend: 1. To all civil causes in which a plain and adequate remedy is not provided in the other judicial tribunals."

The other statute is section 814 of the Code, which is a substantial copy of the act of 1844 copied from the New York statute of January, 1830, set out in *Brown v. Bates,* 10 Ala. 432. The last statute was construed in New York prior to its adoption in Alabama, and the same statute was construed in other States, particularly in New Hampshire.—*Tappan v. Evans,* 11 N. H. 326; *Pinkerton v. R. R. Co.,* 42 N. H. 451; *Chase v. Searles,* 45 N. H. 513. The only change effected by that statute as held in New York and in Alabama and other States, was to allow creditors' bills with general allegations, called fishing bills, without specifying the property to be discovered. That is the statute, as held in New York and New Hampshire, was only declaratory, in other respects, of the common law.—*Bates v. Brown,* 10 Ala.

31c

*supra; Martin v. Carter,* 90 Ala. 96; *Adsit v. Butler,* 87 N. Y. 585.

. It is immaterial, however, as to this statute or its construction, as the whole subject is covered by the first clause of section 638 of the Code. The codifiers of 1852, composed in part of the judges who decided *Brown v. Bates,* in 10 Ala., were well aware of the dispute as to the extent of the jurisdiction of the court of chancery shown by the decisions of *Hadden v. Spader,* 20 Johns. 554, and *Donovan v. Finn,* Hopk. 59, and in codifying the law they had to bring forward as statutory law the doctrine of one or the other of these cases. Following the traditions and decisions of Alabama up to that time, they brought forward the doctrine of *Hadden v. Spader* in a general form, to cover all cases whatever where justice demanded a remedy in favor of a right recognized by the municipal law and where the remedy was defective at law. If, therefore, *Donovan v. Finn* marked the true line of the jurisdiction of the chancery court, then this statute was declaratory to the limit of *Donovan v. Finn* and enacting to the extent of its terms beyond that decision. This is admitted in the case of *Durant v. Supervisors,* 26 Wendell 66-8, in reference to the law of New York, but whether admitted or not, it is an evident fact. The statutes of the United States are the converse of section 638 of the Code. The Revised Statutes of the United States, section 723, provide that 'suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate and complete remedy may be had at law." These statutes are construed throughout the United States as being identical in their purport and effect—the one declaring the jurisdiction, and the other negativing it.

Mr. Pomeroy says that the effect of these statutes in one case using granting terms and the other restrictive words, is: "that the equitable jurisdiction exists and will be exercised in all cases and under all circumstances where the remedy at law is not adequate, complete and certain so as to meet all the requirements of justice."—1 Pom. Eq., §§ 289-300.

. The Alabama statute has itself been construed in *Waldron, Isley & Co. v. Simmons,* 28 Ala. 629. It is there held that the words "is not provided in other judicial tribunals" in section 638, did not refer to remedies in the Code itself or remedies given by statute, but to the administration of the common law in the jurisprudence of Alabama. It is very evident that the decision in 28 Ala. *supra,* was not intended to narrow the legal effect of the words used in the statute. Therefore, it seems plain that if this is a civil case, and if the municipal law entitled the plaintiff to look to the whole estate of the defendant for the payment of its debt which is not especially exempted, which cannot be doubted (*Sims v. Gaines,* 64 Ala. 398) ; and if by the course of the common law, as administered in this State, there is not a plain and adequate remedy, which is shown by the return of no property on the execution (*Brown v. Bates,* 10 Ala. 432), the jurisdiction of the chancery court must attach by virtue of the express words of the statutory law.

As to the original jurisdiction of the chancery court: The history of the origin and development of the jurisdiction, as given by every author and every decision treating upon the subject, shows that it is a prerogative power of an absolute sovereign delegated by the great seal to the chancellors of England to afford a remedy in every case where justice, as defined by the principles of the municipal law, called for a remedy and there was none at law. This is beautifully shown in the brief of Lord HARDWICKE, in the case of *Rex v. Hare,* 1 Strange, 146, and in his celebrated letter on equity jurisprudence to Lord Kames after he ceased to be chancellor, set out in Parke's History of Chancery, p. 501. It is also shown in every treatise upon equity jurisprudence.—Adams' Eq. Jur. p. 30 ; 1 Story's Eq., §§ 41-9 and 53 ; 1 Pom. Eq., §§ 1 to 60 ; 1 Spencer Eq. Jur. § 709, *et seq.*

. The principle of its interference is that where no remedy, or an imperfect remedy, is given by law for the protection of any right, whether the defect arises from an original imperfection of the common law or from a disuse or abandonment of the particular remedy which

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

was or might have been efficient, the chancery court interferes and provides a remedy so long as the right exists. Up to the chancellorship of Lord Thurlow in 1790, numerous English cases directly upon the point were decided. These cases are:

*Edgell v. Heywood,* 3 Atk. 352, decided by Lord. Hardwicke in 1746, which explains fully the whole jurisdiction. The right to *ca. sa.* having been lost in that case by the discharge under the insolvent law, the right to proceed against choses in action could only be exercised in equity, and accordingly the right was enforced on general principles and not as stated in *Durant v. Supervisors,* 26 Ward, 66, in pursuance of a special remedy given by the statutes.—*Taylor v. Jones,* 2 Atk. 600 divided in 1743, in which the right to *ca. sa.* was taken away by agreement.—*King v. Dupine,* cited in the note to *Taylor v. Jones,* decided in 1744 by Lord Hardwicke and mentioned by Chancellor Kent in *Bayard v. Hoffman,* 4 Johns. Ch. 450. *Horn v. Horn,* Ambler, 59, in which the ground of refusing relief was that after the bill was filed the defendant was taken upon a *ca. sa. Partridge v. Gopp,* Ambler, 596; 1 Eden, 163, decided in 1758. *Lawkner v. Freeman,* Precedents in Chancery 105, decided in 1699 by Lord Somers. *Smithier v. Lewis,* 1 Vernon 398. *Agnell v. Draper,* 1 Vernon 399, in which the relief was not granted only because the execution had not been returned unsatisfied. In the note to the cases in 1 Vernon, 398-9, are a number of cases cited, upholding the distinction taken by Judge Collier in *Brown v. Bates,* 10 Ala. 432, that a bill in such cases at common-law had to specify the particular assets to be discovered and could not be a fishing bill. In *Mountford v. Taylor,* 6 Ves. Jr. 788, the defendant was a member of parliament and not subject to arrest, and for that reason a bill of discovery was allowed, which is the identical principle of *Taylor v. Jones* and *Edgell v. Heywood, supra,* and *Bean v. Smith,* 2 Fed. Cas., 1143. And on the principle of the disuse of real actions in which waste could be prohibited at law, an injunction is allowed in aid of an eject-

ment.—Cooper's Equity, XXXIV; *Smith v. Collier,* 8 Ves., Jun. 90.

In England, where there was always in operation a bankrupt law, as well as the right to a *ca. sa.,* there was little occasion for an appeal to equity to subject choses in action; but in 1790, the case of *Dundas v. Dutens,* reported in 1 Versey, Jr., 196, but better reported in 2 Cox, 235, came up before Lord Thurlow. It was a case of a post-nuptial settlement by a husband of bonds for the use of his family. The creditors sought to subject them, and two precedents only were cited in favor of the jurisdiction—*Horn v. Horn* and *Taylor v. Jones.* The chancellor held that the settlement was not fraudulent, but went on to say by way of *dictum* that even if the sttlement had been set aside, he would hesitate to follow the authorities cited, on the ground that choses in action were not liable to execution. This *dictum* was repeated in a number of subsequent cases, but never, so far as we have been able to discover, went into a decision of the court denying relief except in the case of *Simms v. Thomas,* 12 Adolphus and Ellis, 536-50, (decided in 1841) which was a proceeding to condemn a bond conditioned for an annuity, and it was held that the bond did not come under the head of goods and chattels mentioned in 13 Eliz., c. 5, and therefore the assignment of the same could not be fraudulent, and therefore could not be reached in equity.—*Norcutt v. Dodd,* 1 Craig and Phillips 100; *Matthews v. Feavor,* 1 Cox 278; *Stokoe v. Cowan,* 29 Beavan 637; *Warden v. Jones,* 2 DeG. & Jones 76; *Appeal of Elliott,* 50 Pa. St. 75, 88, Am. Dec. 528.

The principle of the English decisions and *dicta* was that choses in action were not within the 13th Eliz., c. 5, but the American construction of that statute includes choses in action as much as any other property, and in Alabama there is a verbal change in the statute covering every species of property. Therefore, if the *dicta* and cases following *Dundas v. Dutens,* in England were sound, the principle would have no application in America, and particularly in this State. The English cases supporting *Dundas v. Dutens,* as well as

those supporting Lord Hardwicke, are ably reviewed by Chancellor Kent in *Bayard v. Hoffman,* 4 Johns. Ch. 450, and by Wordworth, J., in *Hadden v. Spader,* 20 Johns. 554. The following amongst other cases in America, outside of Alabama, support the doctrine of *Hadden v. Spader* and the English cases upholding its principle: *Bean v. Smith,* 2 Fed. Cas. 1143; *Verdier v. Foster,* 4 Rich. Eq., 227; *Ager v. Murray,* 105 U. S. 126; *Public Works v. Columbia Col.* 17 Wall., 530; *Wood v. Dummer* (3 Mass. 308), 30 Fed. Cas. 435; *Hopkirk v. Randolph* (2 Brock. 132), 12 Fed. Cas. 513; *Hatch v. Dana,* 101 U. S. 205, and authorities there cited; *Miller v. Sherry,* 2 Wall. 237; 6 Notes U. S. Rep. 408; *Pacific Bank v. Robinson,* 57 Cal. 520; 40 Am. Rep. 120 and note; *Hook, Skinner & Co. v. Fentress,* (N. C.) Phil. Eq., 229; *Brown v. Long,* 2 D. & B. Eq. 138; 1 Ired. Eq. 190; *Howell v. Powell,* 63 N. C. 283; *Wright v. Petrie,* 1 S. & M. 320; *Meyer & Coulson v. Zanesville Turnpike Co.,* 11 Ohio, 274; *Administrators v. Congregational Society,* 11 Vt. 283; *Knightly v. Wells,* 27 Ind. 386, confessing the error of that court in supporting *Donovan v. Finn; Wadsworth v. Schiesselbauer* (Minn.) 19 N. W. 390; *Baxter v. Moses,* 77 Me. 465; 52 Am. Rep. 783; *Elliott's Appeal;* 50 Pa. St. 75; 88 Am. Dec. 525; *Funk v. Voneida,* 14 Am. Dec, 626; *Williams v. Hubbard,* (Mich.) Walker's Ch. Reps. 28; *Chase v. Searles,* 45 N. H. 513; *Tappan v. Evans,* 11 N. H. 227; *Bay State I. C. v. Goodale,* 39 N. H. 223; *Pinkerton v. R. R. Co.,* 42 N. H. 451; *Catchings v. Manlove,* 39 Miss. 655; *Sargeant v. Selmon,* 27 Miss. 543; *Watkins v. Dorsett,* (Md.) 1 Bland 531. And lastly the decisions of New York, the more important of which are: *Adsit v. Butler,* 87 N. Y. 587, overruling *Durant v. Supervisors,* 26 Wend. 660, confirming *Hadden v. Spader and Dunlevy v. Tallmadge,* 32 N. Y. 460. *Hadden v. Spader,* 20 John. 554, which we consider perhaps the finest opinion in the English language. *Bayard v. Hoffman,* 4 Johns. Ch. 450, where the English authorities are reviewed by Chancellor Kent. *McDermutt v. Strong,* 4 Johns. Ch. 687, where the chancellor refers to his decision in *Bayard v. Hoffman,* and says that in that case

the authorities were examined touching the power of this court to enable a creditor to reach the trust property, "and I conclude that the court had and ought to have the power." *Earneston v. Lyde,* 1 Paige 637; *Beck v. Burdette,* 1 Paige 305; *Weed v. Pierce,* 9 Cowen 722; *Storm v. Waddell,* 3 Sanford Ch. Reps. 511; *Petit v. Candler,* 1 Paige 168; *Dunlevy v. Tallmadge,* 32 N. Y. 459; *Child v. Brace,* 4 Paige 637; *Gleason v. Gage,* 7 Paige 121.

Some of the Alabama cases that uphold the doctrine of *Hadden v. Spader* are: *Brown v. Bates,* 10 Ala. 432; *Pharis v. Leachman,* 20 Ala. 676; *Lyon v. Bolling,* 9 Ala. 463; *Roper v. McCook,* 7 Ala. 324; *Reese v. Bradford,* 13 Ala. 345; *Floyd v. Floyd,* 77 Ala. 353; *Carter v. Coleman,* 82 Ala. 181; *Matthews v. M. Ins. Co.,* 75 Ala. 89; *Lehman v. Mayer,* 67 Ala. 401; *Mixon v. Dunklin,* 48 Ala. 455; *Allen v. Montgomery, etc. R. R. Co.,* 11 Ala. 449-50, in which the court said, in reference to subscriptions to stock sought to be subjected that it made no difference whatever, as to the jurisdiction of the chancery court, in what form the assets were; *Dargin v. Waring,* 11 Ala. 988; *VanDeGraff v. Medlock,* 3 Port. 389; *Cumming & Cooper v. McCullough,* 5 Ala. 38; *Morgan v. Crabb,* 3 Porter 470; *Saunders v. Watson,* 14 Ala. 198; *Bank of St. Mary's v. St. John Powers & Co.,* 25 Ala. 556, where the court, speaking of the right to subject stock, at page 624, said: "Such stock is to be regarded as a chose in action, and constitutes a portion of the equitable estate of its owner, and as such may be chargeable in equity under the ordinary powers of this court, and is expressly chargeable by attachment under the first section of the act of 1846." *Martin v. Carter,* 90 Ala. 96; *Janney v. Buell,* 55 Ala. 408, holding that it is the province of equity to furnish a remedy when there is none at law to protect any right recognized by the municipal law.

The following cases hold that there is no right in a debtor to possess and enjoy any estate, not expressly exempted, in defiance of his creditors; and that any estate held may be reached in law or in equity: *Simms v. Gaines,* 64 Ala. 398; *Cook v. Kennedy,* 12 Ala. 48; *Bender v. Reynolds,* 12 Ala. 459; *Lavender v. Lee,* 14 Ala.

692; *Hill v. McRae,* 27 Ala. 182; *Robinson v. Johnson,* 36 Ala. 202; *Smith v. Moore,* 37 Ala. 332; *Nelson v. McCrary,* 60 Ala. 310; *Sandlin v. Robins,* 62 Ala. 477; *Taylor v. Harwell,* 65 Ala. 13; *Bell v. Watson,* 82 Ala. 512; Brickell's opinion in *Ex parte Hardy,* 68 Ala. 340.

If the court had original jurisdiction in such cases, or if it is given jurisdiction under sections 638 or 814 of the Code, it makes no difference that prior or subsequent statutes afford a remedy by garnishment.—*Kemp v. Prior,* 7 Ves. Jr. 249; *Waldron Isley & Co. v. Simmons,* 28 Ala. 629; *Jackson v. Jackson,* 91 Ala. 292. In *Sheppard v. Iverson,* 12 Ala. 99, Judge Goldthwaite retracts his *dictum* in *Allen v. M. R. Co.,* 11 Ala. 499, to the contrary of this.

The election was a waiver. The court certainly had jurisdiction of the subject-matter. A decree in favor of the plaintiff would not be void.—*Hatch v. Dana,* 101 U. S. 205; *Hall & Farley v. Henderson,* 114 Ala. 601. When the defendants then required the appellants to elect between suing at law and in equity, then waived the point of jurisdiction as to the particular case. Otherwise, they make the court an instrument of injustice.—*Donovan v. Finn,* Hopk. 59, and in the cases following it.

The case of *Donovan v. Finn* is a new doctrine, originating with Senator Platt and Chancellor Sanford. It does not purport to follow *Dundas v. Dutens,* 2 Cox. 235. On the contrary, it repudiates the *dictum* of that case, which was that choses in action could not be fraudulently conveyed because they could not be reached by execution in the hands of the debtor, while it holds that fraud which does not injure the creditor enlarges his rights and gives jurisdiction to the court—both of which propositions are contrary alike to reason and authority.

Fraud does not give jurisdiction.—3 Brick. Dig., 342, § 173; *Youngblood v. Youngblood,* 54 Ala. 486; *Smith v. Cockrell,* 66 Ala. 64; *Kimball v. Greigg,* 47 Ala. 230. Nor can there be fraud unless some original right is affected thereby.—*Kennedy v. Kennedy,* 2 Ala. 593; *Costley v. Allen,* 56 Ala. 202. "Conveyances or trans-

fers of property not liable to the payment of debts, cannot * * * operate to defraud creditors, and will not at their instance be avoided."—*Simms v. Gaines*, 64 Ala. 398; *Kennedy v. F. N. Bank*, 107 Ala. 182; *Fuller v. Whitlock*, 99 Ala. 411.

The concession of the case that choses may be fraudulently conveyed admits that they are liable for the payment of debts, and the common law remedy of *ca. sa.* being obselete or done away with, necessarily imposes the duty of supplying a remedy on the chancery court. And if the jurisdiction is exercised when fraudulently conveyed, it implies the right and is founded on the right to condemn the property in the hands of the debtor or of others without fraud, as in the cases of *Wood v. Dummer*, 3 Mason, *supra; Hatch v. Dana*, 101 U. S. 205. The property is never condemned for fraud, but notwithstanding the fraud, some original right is pursued and enforced.—*Hubbard v. Allen*, 59 Ala. 303. And the court of chancery is appealed to in the particular case because the law remedy is not adequate.—*Smith v. Cockrell*, 66 Ala. *supra*.

There is not a case supporting the doctrine of *Donovan v. Finn*, so far as our researches extend, that appeals to or at all considers the origin and history of the court of chancery; and thus each one overlooks the fact that its original jurisdiction and mission was, as it still is and must always be, to supplement the law, "so as to serve the wants of mankind."—1 Story's Eq., § 53; 1 Pom. Eq., 50-66-7; 1 Spence Eq., 704-8; *Janney v. Buell*, 55 Ala. 408; Judge Brewer in 19 L. R. A., 399.

McCLELLAN, C. J.—The bill in this case is filed by Joseph L. Hall and Louis B. Farley, the assignees of a judgment recovered for the Farley National Bank, against the Alabama Terminal and Improvement Company—hereinafter called the Terminal Company. Within a year after the rendition of this judgment, and before the filing of the bill, execution issued on it and was duly returned "no property." The bill was filed March 17, 1894. As originally exhibited and as prosecuted until after the evidence had been taken, the sole

purpose of the bill was to collect from certain persons who are made respondents the amounts which they had severally subscribed to the capital stock of the Terminal Company, the defendant in judgment, which the bill alleged they respectively claimed to have been paid, but which it further alleged they had not paid, and to apply the sums so collected to the satisfaction *pro tanto* of said judgment; and the original prayer for relief, which has never been amended, nor attempted to be amended, is "that the said defendants, severally and respectively, be required to pay for the satisfaction of said judgment in favor of the said Hall, receiver, (of the Farley National Bank) against the said Alabama Terminal and Improvement Company their said subscription to the said capital stock of the said company and their said several promises in writing. And for such other and further relief as to your Honor may seem meet and the facts of the cause require." In respect of the claims of payment asserted by the several respondents it is averred in the bill, by way of anticipating the defenses which it was supposed would be relied upon, that Woolfolk, who was president of the Terminal Company, pretending that as such president he was thereunto duly authorized but not having in fact any such authority proposed to the respondents severally that if they would pay to the company their subscription notes the said company would thereupon purchase their shares of stock at par and pay for the same in some instances in money and in other instances in bonds of the Alabama Midland Railway Co. at the market value thereof, eighty-five cents on the dollar of their face value, that accepting and acting upon this proposition the respondent subscribers paid their subscription notes, and thereupon sold their stock to the Terminal Company and some of them took such bonds in payment therefor, and others took notes executed by Woolfolk for and in the name of the company secured by the stock which they had thus sold, left with them for that purpose, and also secured in some instances by bonds of said Midland Company, which bonds were assets of the Terminal Company. That the point we are upon may be more fully pre-

sented we quote the general averment of the bill with
reference to all those. parties, and the special averment
as to one of each of the classes indicated above. The gen-
eral averment constitutes paragraph 20 of the bill, which
is as follows: "Your orators further state that the de-
fendants Charles Henderson, Jere C. Henderson, La-
Fayette Henderson as surviving partner of the late firm
and partnership of L. and W. J. Henderson, Fox Hen-
derson and James M. Henderson, partners under the
firm name and style of J. M. Henderson & Co., Gustavus
Hendricks, John S. Carroll, and said John S. Carroll
and Thomas E. Murphree, partners in trade under the
firm name of Carroll, Murphree & Co., severally and
respectively, claim that they have paid their said sub-
scriptions to the capital stock of the Alabama Terminal
and Improvement Company, and that the promises in
writing that they severally made as aforesaid for the
payment thereof, have been cancelled and surrendered
to them respectively. But your orators aver that there
was not in fact any payment of the said subscriptions,
or of said promises in writing, or of either of them. And
if said promises in writing, or either of them, have been
cancelled and surrendered to the said defendants, or
either of them, such cancellation and surrender was
unauthorized and illegal, and said subscriptions and
promises in writing remain due and unpaid." And in
paragraph 23, the foregoing averment is repeated as
to the respondents Brantley & Son. Such are the gen-
eral averments as to the payments claimed to have been
made. The special averments as to such of them as
received Midland bonds for their stock are as follows:
"21. Your orators further aver on information and be-
lief that the said defendant Woolfolk, pretending that
as president of the Alabama Terminal and Improvement
Company, he was authorized thereunto, but not having
such authority, proposed to purchase of the said defend-
ants, L. & W. J. Henderson, James M. Henderson &
Co., Gustavus Hendricks, John S. Carroll, and Carroll,
Murphree & Co., severally and respectively, for the said
company, their several and respective shares of stock in
said company, giving them therefor the bonds of the

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

Alabama Midland Railway Co., a corporation organized and existing under the laws of the State of Alabama, known as the Alabama Midland Extension Bonds, at eighty-five per cent of the par value of said bonds. These bonds were the property and assets of the said Alabama Terminal and Improvement Company, and that fact was well known to said parties respectively and severally. And it was further proposed by said Woolfolk that said parties should pay him the amount of their said several subscriptions and promises in writing and he would cancel and surrender to them their said promises in writing, and deliver to them the said Alabama Midland Extension bonds. The said parties severally and respectively accepted the said proposition of said Woolfolk and gave him sums of money equal to the amounts of their said several subscriptions and promises in writing, and he delivered to them marked 'cancelled' their several promises in writing and bonds of said Alabama Midland Railway Company, known as the Alabama Midland Extension Bonds, for an amount of 85 cents on the dollar of the par value thereof, equal to the amount of money received from them. And this is the transaction in and by which the said parties severally and respectively claim to have paid their subscriptions and promises in writing." As to one of the class of persons whose stock was purchased by Woolfolk for money, the following is the further averment of paragraph 21: "Orators further aver on information and belief that the said defendant Woolfolk, pretending that as president of the Alabama Terminal and Improvement Company he was thereunto authorized, but not having such authority, proposed to purchase of the said defendant Charles Henderson, for the said company, his shares of stock therein at and for the sum of ten thousand dollars (the par value of said shares) to be paid for out of moneys belonging to said Alabama Terminal and Improvement Company, and it was further proposed by the said Woolfolk that the said Charles Henderson should pay him the amount of such subscription and promise in writing and he would cancel and surrender to him his said promise in writing and would deliver to him the

[Henderson *et al.* v. Hall *et al.*, and Hall *et .al.* v. Henderson *et al.*]

note of the said Alabama Terminal and Improvement Company for the sum of ten thousand dollars payable three months after its date secured by a deposit of ten thousand dollars or other large sum of said Alabama Midland Railway bonds, the property and assets of the said Alabama Terminal and Improvement Company. The said Henderson accepted said proposition of said Woolfolk and gave him the sum of money equal to the amount of his subscription and promise in writing, and the said Woolfolk delivered to him marked 'cancelled' his said promise in writing, and also the note of the Alabama Terminal and Improvement Company payable as above stated and secured by a deposit of the said extension bonds; and this is the transaction in and by which the said defendant Charles Henderson claims to have paid his said subscription and promise in writing. Orators are not informed as to whether the said note has been paid, but they aver that if the same has not been paid the said Henderson has in his possession the said bonds delivered to him as aforesaid and that said bonds are the property and assets of the said Alabama Terminal and Improvement Company; and orators aver that said transaction with the said Charles Henderson on the part of said Woolfolk was a mere device on their part to shield the said Henderson from payment of his subscription for stock, and was and is fraudulent as to orators." Like averments are made in respect of the claim of payment on the part of Jere C. Henderson, except that it is alleged in the alternative that he was to receive and did receive either money or bonds for his stock. And in respect of Brantley & Son the averment is that upon and in acceptance of the aforementioned unauthorized proposition of Woolfolk, they paid their subscription and sold their stock to him for the company, taking the company's notes for the par value thereof, and that these notes were afterwards paid by Woolfolk with funds of the company.

It is nowhere nor in any way averred in the bill that the Terminal Company ever authorized Woolfolk to make these settlements, or any of them, with said subscribers to its stock, or that it ever ratified his action

therein; but to the contrary such authorization is expressly negatived, as we have seen, by the averments of the bill, and no fact is therein stated upon which could be rested a conclusion that the company itself was or is in any way bound by either of those transactions. Especially is this true when the rule requiring the averments of the bill to be construed on demurrer most strongly against the complainants is applied in the premises to the exclusion of every possibility of a construction whereby the averments of want of authority might be held to refer to the Terminal Company itself and not to Woolfolk. But even without this rule the bill leaves no room for the conclusion that the claimed payments are attacked because the transactions in which they were made were *ultra vires* the corporation itself. The passing of the money for these subscription notes to Woolfolk is conceived by the complainants to be ineffectual as payments thereof to the corporation because Woolfolk as president of the company had no authority to receive such money as payments under the conditions which obtained and which he assumed to carry out and did carry out as president and in the name of the company. It is not even averred that the company ever received the money which was paid. Not having authorized these transactions, nor ratified them, nor been beneficiary of their issues so as to preclude itself, the Terminal Company was in no degree hindered or estopped at the time this bill was filed to treat Woolfolk's unauthorized action as a nullity, to repudiate the transactions as payments to it, and to institute suits at law in its own name and behoof upon the subscription notes which had been illegally and inefficaciously cancelled, and surrendered by Woolfolk to the makers. The Terminal Company having this right at that time, it, of course, necessarily follows that the complainants had a plain, adequate and complete remedy at law for subjecting the amounts due from the subscribers named to the satisfaction of their judgment by the process of garnishment authorized by section 2972 of the Code of 1886, then of force, and that their bill of complaint was subject to the objections taken in this connection by the

[Henderson *et al.* v. Hall *et al*, and Hall *et al.* v. Henderson *et al.*]

demurrers of the several respondents to whom we have referred. And even if complainants did not have this remedy at law, it would by no means follow that they could come into chancery. To the contrary, on the facts averred, as we construe them, but for the statute providing the proceeding by garnishment they would be entirely remediless in the premises.

Against this conclusion counsel for appellees urge several considerations which we will examine and discuss. Chief among these contentions is this: That the chancery court has and all along has had jurisdiction to enforce at the suit of a creditor of a corporation the payment of subscriptions to its capital stock, and that having this original and inherent jurisdiction it was not and is not ousted of its exercise by statutes which confer like power on courts of law by process of garnishment; and, as they insist, it is well settled, that "the enlargement of jurisdiction of courts of law, or the recognition and enforcement by them of equitable rights and interest, even when conferred in terms by statute, does not, in the absence of statutory prohibition, take away or impair the original jurisdiction of the chancery court." But it is not well or at all settled, and it is not true in point of legal fact, that the chancery court ever had or has original jurisdiction at the suit of a corporation creditor to coerce the payment by stockholders of their subscriptions to its capital. Such debts to a corporation stand upon the same footing as indebtedness generally. In the absence of statutes on the subject, no court, whether of law or equity, has any power to reach and subject this class of a debtor's property to the satisfaction of demands against him. At the common law choses in action of the debtor were not leviable, and the process of garnishment was unknown. There was under that system an indirect method of reaching such assets by the attachment of the debtor-defendant's person and his incarceration until the judgment against him was satisfied, the theory being that this process would coerce him into a realization upon choses in action belonging to him and to the application of the funds arising from their collection to the judgment under

which he is attached and imprisoned. But that proceeding has no place in our law; and if a creditor relies upon any other process as a means of applying the choses in action of his debtor to the payment of his claim he must be able to point out some statutory provision giving the process or remedy he invokes, and he must pursue such remedy either according to the terms of the statute and in the form prescribed by it, or he must show that the legal right conferred upon him by the statute has been so clogged and impeded of enforcement in the statutory forum, the court of law in garnishment proceedings, as that he is entitled upon some recognized principle of equity jurisdiction in aid of legal rights to call to his assistance the powers of the chancery court. And when chancery is thus invoked it is not upon any theory that such court has or had original jurisdiction in the premises, or could have been resorted to before the statute giving the right at law, but upon the idea that by reason of fraud and the like the legal remedy to enforce the right conferred by the statute has become inadequate thereto, some ground of equity interposition has arisen. Of course, if a chose in action, belonging to the debtor has become impressed with a trust in favor of the creditor, chancery in the absence of statute has jurisdiction to subject it to the debt; and it is upon that principle, as we shall see, that the present bill is really sought to be maintained, but, as we shall further see, that doctrine does not obtain in this case. Recurring to the main proposition, that chancery had no original jurisdiction to subject choses in action of a debtor to the claims of his creditor, we refer to and collate some of the authorities sustaining it. In *Donovan v. Finn,* 1 Hopkins, Ch. 59, s. c. 14 Am. Dec. 531, there is a most able and elaborate examination and consideration of the authorities and discussion of the question, leading up to and sustaining the proposition embodied in the head note that "property not subject to execution at law, such as choses in action, cannot be reached in equity, unless the case is otherwise of equitable jurisdiction, as where the property was fraudulently converted into choses in action to defraud cred-

itors." The whole of the very learned opinion in that
case might be embodied here with advantage, but we
content ourselves with some of the most pertinent parts
of it. In stating the case before the court and the ques-
tion for decision, the opinion proceeds thus: "The
cause thus considered presents these facts: A creditor
has obtained judgment against his debtor in a court
of law, an execution has issued against the property of
the debtor, and the sheriff has returned that none is
found. The debtor has property, consisting in a debt
due to him, and the creditor by judgment now asks this
court to compel the debtor of his debtor to make pay-
ment to him in satisfaction of the judgment. Has this
court jurisdiction in such a case, or power to give relief?
To apply existing laws to new cases is the duty of
courts of justice, and it is not an encroachment; and the
application of established principles of equity to new
cases in this court, is not an extension of its jurisdic-
tion. But this court has no power to assume any juris-
diction really new, and extending beyond the limits of
its established authority. It is apparent that this case
does not belong to any general head of equitable juris-
diction, such as frauds, trusts, accidents, mistakes, ac-
counts, or the specific performance of contracts. Here
is neither fraud, nor trust, nor accident, nor any other
ingredient of equitable jurisdiction. It is simply the
case of two debtors and two creditors, of whom one is
both debtor and creditor; a case in which the rights and
remedies of the respective parties have hitherto been
enforced exclusively in the courts of law." And after
discussing English and American cases bearing on the
point, Chancellor SANFORD proceeds: "According to our
distribution of jurisdictions, suits for the recovery of
ordinary debts are appropriated to the courts of com-
mon law; and the proceedings for enforcing the judg-
ments rendered in such suits are alike allotted to those
courts. In any such case where the subject of the suit
is exclusively of legal cognizance, a court of equity has
no jurisdiction to enforce the judgment by its own meth-
ods of proceeding, or to give a better remedy than the
law gives. If the remedies of the law are imperfect,

32c

equity, as has been often said in the English chancery, has no jurisdiction to give execution in aid of the infirmity of the law. When any fact giving equitable jurisdiction intervenes in the transactions between creditor and debtor, such a fact becomes a foundation of relief in this court; but in any ordinary case, free from fraud or injustice, the execution of the judgment and the methods of compelling satisfaction, are confined to the courts of law. When a creditor comes to this court for relief, he must come, not merely to obtain judgment or satisfaction of a judgment, but he must present facts which form a case of equitable jurisdiction. He must show that the debtor has made some fraudulent disposition of his property, or that the case stands infected with some trust, collusion or injustice, against which it is the province of this court to give relief. In such cases this court has jurisdiction, not for the purpose of giving a species of execution which the courts of law do not afford, but for the purpose of giving relief in the particular cases allotted to its jurisdiction; and when the cause, by reason of such facts, is properly here, the court proceeds, upon all the circumstances of the case, to give final and equitable relief.   *   *   *   When it is said that a debtor may now convert all his effects into stocks, credits, or other things in actions, and may in his own name, or in the name of a friend, hold his property in these forms, in defiance of his creditors, our laws are reproached by a vague assertion, which is partly true, and is to a much greater extent erroneous. All conveyances made to defraud creditors are void both in law and equity. When the fraud appears to a court of law, the conveyance is there adjudged void. When such a fraud is presented to this court, it is of equitable jurisdiction; and the property of the debtor, fraudulently transferred, is subject to the satisfaction of his debts, in favor of a creditor complaining of the fraud.   *   *   *   In all such cases this court vacates the fraud, sets aside the conveyance in trust, and, acting both upon the debtor and his trustee, it does complete justice to the creditor. Thus, the jurisdiction of this court reaches, and reaches effectually, those cases of

fraudulent conveyances and assignments in trust, which form the great and most vexatious impediment in the course of justice between creditor and debtor.   *   *   * But this court has no power to cause stocks, credits and rights of action, held by a debtor, without fraud, to be sold or converted into money, to be transferred to the creditor, or to be applied to the payment of debts. The English courts of equity have never exercised any power like that now proposed, over the rights of a debtor; and it is certain that no such power has ever been exercised by any court in this State. But is said that a failure of justice must take place, if such a jurisdiction should not be exercised by some of our courts of justice. How, it is asked, is all that class of personal effects, consisting in stocks, credits and property in action, in various forms, a class of property, which, in this community, is very great, to be subjected to the payment of debts? That such property should be made subject to the payment of the debts of its owner is not denied. That such property cannot be seized or sold by the sheriff upon an execution, is the existing law of the State. That in the present state of our laws, a debtor sometimes holds and enjoys this species of property, while his debts remain unpaid, may be true. These reasons may show that the existing laws are imperfect; and that some convenient method of subjecting this class of property to the payment of debts would be a desirable amendment; but they do not show that this court or any other tribunal has power to make such an amendent. The argument so strongly urged, that justice requires some new remedy in these cases, is an argument to be addressed to the legislature, and not to the courts of either law or equity. Our ancient law was not destitute of remedy in such cases. That law was intended and adapted to compel the application of all the property of the debtor to the discharge of judgments against him; and for that purpose different kinds of executions were provided. By executions against his property in possession, that species of effects was subjected directly to the discharge of a judgment; but his things in action were reached only by an execution against his person, upon which

he was imprisoned until he should satisfy the judgment. The execution against the person was a method of coercion intended to bring forth for the satisfaction of the judgment, all such effects of the debtor as could not be subjected to the other execution; and it was a powerful remedy. That remedy has been gradually relaxed by the legislature until it has nearly lost its efficacy; and while this great change respecting executions against the person has been made, the rules concerning executions against property have remained without alteration. Thus the imprisonment of the debtor, as a remedy, has been, in effect, taken away; no effectual method of execution against his property in action has been substituted, and this change in our laws has been made by the legislature itself.   *   *   *   Our law of relief against absconding and absent debtors, is a law of attachment. This special statute, containing a system of provisions in detail, is alone a sufficient proof that the proceeding by attachment can be authorized only by the legislature and that such a process of power, belongs not to any court of this State, in virtue of its general jurisdiction. The attachment given by this statute embraces all debts due to the debtor, is for the benefit of all his creditors; and is authorized only against absent, absconding, and concealed debtors. The legislature has not given this remedy against debtors residing or found within the State, and subject to the full operation of its general laws. The attachment now proposed is against a single debtor of the judgment-debtor, for the benefit of the judgment-creditor; and all the parties reside in the State. Thus it is proposed that this court shall institute a new species of attachment against debtors within the State, a new method of justice in favor of creditors, differing greatly from any attachment or any execution hitherto known, and which, however it may be recommended, has not yet been adopted by our law. In several of the States of the Union there are laws of attachment, by which a creditor may sequester or attach, for his exclusive benefit, a debt due to his debtor; and it is said that these laws are useful and efficacious, in promoting the

ends of justice. But in all those States, these attachments have been introduced and established by special acts of their legislatures; this proceeding being unknown equally to the common law and to the equity of England. But while the attachment of the debt due to a debtor for the benefit of the creditor instituting the suit, is a proceeding unknown to the general system of English law and equity, it is fully established in the city of London, under the name of the custom of foreign attachment, and it there takes place in a local court of special jurisdiction. Thus stand both the general law and the exceptions to it, in England; and equity has never altered but has always followed the general law. The court is now, for the first time, asked to do what, in England, is done, only in London, by a special custom of that city, what in other States of this Union is done only under the provisions of special statutes, and what, in this State, has never yet been done or authorized by any law. * * * Under the constitution, the course of common law, the trial by jury, and the system of equity, must all be maintained in their respective spheres of operation. If the existing difficulty in these cases arises from the rule of law, that stocks, credit, and rights of action cannot be sold by the sheriff, is that rule salutary, since the remedy by imprisonment of the debtor has been so greatly relaxed? If some new proceeding by way of attachment or execution against the rights in action of a debtor is requisite, on what courts or officers shall such a power be conferred, and in what cases, and under what regulations shall it be exercised? But I forbear to pursue these inquiries and reflections; and these are suggested merely to show the magnitude of the innovation now proposed. Should this court take cognizance of these cases, they would form a chapter of jurisdiction far more ample than any one which it now possesses, and the assumption would be a bolder stride of power than was ever made by the English chancery in any single age. The maxim which teaches us that a judge should amplify his own jurisdiction, has no place in our institutions. The utility of this court, so important in the general structure

of our system, will be best consulted and preserved by preserving its jurisdiction within the limits which are now established. My views of this question terminate in the following results: 1. The cases of authority in which relief has been given to judgment-creditors were, in themselves, cases of equitable jurisdiction, involving fraud or trust, or seeking to subject to the satisfaction of a judgment property in itself liable to execution by removing a conveyance which operated as a fraudulent impediment to the execution. 2. This court has no power to compel the debtor of a judgment-debtor to make payment to the judgment-creditor, in satisfaction of the judgment."

This case of *Donovan v. Finn* was decided in 1832. In 1880 it was published in 14 Am. Dec. pp. 531 *et seq.*, with the following note by Mr. Freeman: "It is doubtful, where there has been no legislation upon the subject, whether in the absence of fraud, or any other well known ground for supporting the exercise of its jurisdiction, equity will assist a creditor to reach those assets of his debtor which under no circumstances could have been subject to execution at law. This question has been most debated with reference to stocks and choses in action. Notwithstanding a contrary opinion expressed by some very eminent American jurists, we judge that the weight of the authorities is in support of the view that equity has no power in ordinary cases to compel the appropriation of choses in action to the payment of their owner's debts.—*Watkins v. Dorsett*, 1 Bland. Ch. 533; *Stewart v. English*, 6 Ind. 176; *Wallace v. Lawyer*, 46 Ind. 501; *McFerran v. Jones*, 2 Litt. 219; *Dundas v. Dutens*, 1 Ves. Jr. 196; *Nantes v. Carrock*, 9 Ves. 188; *Rider v. Kidder*, 10 Ves. 368; *Grogan v. Cook*, 2 Ball & B. 233."

Another able and exhaustive opinion on this subject was delivered by the Supreme Court of Rhode Island (1884) in the case of *Greene v. Keene*, (14 R. I. 38, s. c. 51 Am. Rep. 400), in which the authorities are examined, the case of *Donovan v. Finn, supra*, is discussed and approved, and the conclusion is reached that "in the absence of fraud, trust or other ground of equi-

table relief, or special statutory jurisdiction, judgment creditors cannot reach choses in action of their debtors by equity proceedings." The same doctrine is announced in the carefully considered case of *Shaw v. Aveline*, 5 Ind. 380; and in *Dayle v. Sleeper*, 1 Dana (Ky.) 531, 534, in *McFerran v. Jones*, 2 Litt. (Ky.) 219, and doubtless in many other cases; and its soundness is so obvious upon elementary principles that it would seem to require no citation of adjudged cases to demonstrate and sustain it.

As under our statutes choses in action belonging to a debtor are leviable in a sense by process of garnishment, they may be reached in equity, as we have intimated and as follows from the principles declared above, when they have been fraudulently disposed of by the debtor in judgment to hinder, delay or defraud his creditors, because such fraud gives equity jurisdiction whether there be a remedy at law or not by which the chose in action could be reached in the hands of the transferee. But as a transaction in form a transfer or disposition of choses in action and even made in the name of the defendant in judgment, but which is wholly unauthorized by him and hence of no binding efficacy upon him, can neither involve fraud on his part nor prevent him to proceed to reduce the choses in action to possession disregarding the transfer, there is in such case no ground of equitable interference—there is no fraud imputable to the defendant in judgment—nor is there any obstacle between the judgment creditor and the subjection of the choses in action to his judgment by process of garnisment at law: He not only has no remedy in chancery, nor would have in the absence of statute, but he has an adequate, plain and complete remedy at law. Assuming that the present bill shows that Woolfolk in fact cancelled the notes of Henderson and others as paid and surrendered them to the makers without consideration, the case supposed is the case presented by this bill, with a distinction without a difference to be presently considered. And, Woolfolk having no authority from the Terminal Company to do what he did, his act is not binding on the company, it

can now sue the makers of these notes just as if no such action had been taken by Woolfolk, and complainants had their remedy by garnishment. And, not only so, but as the judgment debtor, the Terminal Company, has been guilty of no fraud, has not disposed of its choses in action, has done nothing in fact, complainants have no standing in equity, and would have none even if there was no statute giving them a remedy by garnishment.

The cases cited and collated above were cases of individual parties, of natural persons whose choses in action were sought to be subjected in equity to the satisfaction of judgments against them.

The party here whose choses in action are sought to be subjected to complainants' judgment against it is a corporation, and the claim in its favor to be reached are debts which the other respondents, the Hendersons and others, owe the corporation as subscription for or to its capital stock, evidenced by promises under seal to pay stipulated sums severally. And this is the distinction adverted to next above, and which at the time the present bill was filed was supposed, indeed had been held to be a material one. It was at that time supposed and had been in effect held that the capital stock of a corporation was a trust fund for creditors, and it is fair to assume that this bill was filed and prosecuted on that theory. Of course, if the theory is sound, if the capital stock of a corporation is a trust fund, subscriptions to the stock, debts due the fund have a trust character impressed upon them also, and courts of equity, whether there be a remedy at law or not, may under their general jurisdiction to administer trust estates enforce the payment of such debts to the *cestui que trust*, the creditors of the corporation. This doctrine considered in and of itself has in times past received the recognition of this court in *dicta* at least, and, as part of the broader proposition that the property of a corporation under certain conditions constitutes a trust fund for its creditors, it was at one time supported by express decisions of this court. It is the established doctrine now in many jurisdictions. But not so with us. To the contrary, the proposition as a whole and in every part has been re-

pudiated by this court, and it has been directly ruled, adjudged and settled that the assets of a corporation—and its capital and subscriptions due to its capital are in part its assets—under no circumstances constitute a trust fund for its creditors, but that so far as creditors are concerned all its property including its choses in action of all kinds, is held and owned by it just as property—choses in action or what not—is held and owned by an individual debtor, subject to no trust resting on the artificial character of the debtor entity.—*O'Bear Jewelry Co. v. Volfer*, 106 Ala. 205, s. c. 28 L. R. A. 707, 54 Am. St. Rep. 31; *Corey v. Wadsworth*, 118 Ala. 488.

There being then no such fraud averred in the bill as gives equity jurisdiction, and no element of trust in favor of the complainants being presented, the case made is not one of which the chancery court ever had jurisdiction, not one of which it would now have jurisdiction if there were no remedy at law, and, there being a remedy at law, the bill cannot be maintained on the doctrine that original chancery jurisdiction of a subject matter, or to administer a remedy is not taken away or impaired by the statutory provision of a legal remedy in the premises.

We are of course considering the question of the equity *vel non* of this bill with reference to our statutory law as it existed at the time the bill was filed. The act of February 18, 1895, (Acts, 1894-5, p. 881) now embodied in part in section 823 and, for the rest, in section 1282 of the Code, was not then of force, this bill having been filed March 17, 1894. That act, therefore, can have no application here, and would not have even without its express provision that it should not apply to any suits pending at the time of its enactment. The bill in the case of *Hall & Henderson, Trustees, v. Fox Henderson* was filed under that act on June 23, 1896; and so far as any point decided in that case on the first appeal, (114 Ala. 601), or upon the second appeal, recently determined, bears an analogy to the point under consideration, the decisions of it on those appeals favorable to the equity of that bill must be rested upon that act.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

It is contended further that even if the present bill did not have equity when it was filed, or has no equity now abstractedly speaking, equity has injected into it, so to say, or the respondents have estopped themselves to now deny its equity by having on motion in the court below procured an order putting the complainants to an election whether they would further prosecute this suit or certain garnishment proceedings then pending at their suit against the respondents in a court of law and compelling them to dismiss this bill on those proceedings, which order complainants complied with by dismissing the garnishment proceedings. We do not think there is any merit in this position. It would seem to be necessary to say only, in the first place, that jurisdiction of the subject matter cannot be conferred upon any court by estoppel or even by affirmative agreement. But if that could be done, the exercise by a respondent of his right to compel the complainant to dismiss one of two proceedings against him on the same cause of action cannot operate to cut him off from any defense he would otherwise have against the suit the complainants elect to prosecute. The right is given the respondent solely as a means of protecting himself from double prosecution, and he is entitled to that protection wholly irrespective of and apart from the character of his defenses against either suit and without prejudice to them. The right would be of little, if any, value in any case, and a resort to it in many cases at least would be fatal to the respondent's ultimate rights, if he is to be held by its exercise to insure the jurisdiction of the court in which the complainant elects to proceed, or to forego any other defense. He canot be so held. He insures nothing. He waives no defense. The complainant elects at his peril. His choice is free and unfettered; and he must take the consequences of making it ill-advised and unwisely.

The fact that complainants are assignees of the judgment to the satisfaction of which they seek to subject unpaid stock subscriptions does not prevent their suing at law or give them a standing in equity.—*Farmers & Merchants Bank et al. v. Hall*, 120 Ala. 14, s. c. 122

Ala. 668. It is of no consequence that they would have to use the name of the assignor in the legal action. They had the absolute right to do this; and though resorting to this form, they would be in contemplation of law the sole parties to the record.—Code, § 29.

The bill is not multifarious or objectionable for misjoinder of parties respondent. The rights complainants attempt to assert are the same against each one of the respondents against whom appropriate relief is sought and the obligation, if any, of each of them is to pay complainants as creditors of the Terminal Company their several subscriptions to the capital stock of the corporation. In such case in avoidance of a multiplicity of suits the bill, had it been otherwise unobjectionable, was properly filed against them all notwithstanding their interests and obligations as among themselves were entirely independent and distinct.—*Allen et al. v. Montgomery Railroad Co.,* 11 Ala. 437.

The chancellor seems to have entertained some doubt as to whether the cause was submitted on the demurrers which raise the objections to the bill we have been discussing. We think it is clear that the demurrers were embraced in the submission. It is true that they are not mentioned in the note of testimony of several of the respondents, but it was not necessary or even proper that they should have been there set down; and besides they are mentioned in the note of testimony of one or more of the respondents. But there was a written submission of the cause to a special chancellor which clearly embraces all questions and issues in the case both of law and fact, as well on the pleadings as on the evidence; and the chancellor properly concluded that these demurrers were to be passed upon by him.

If the bill had averred that the payments made by the respondents on account of subscriptions to the capital stock of the company were made to the corporation itself and received by it in such a way as would preclude the company and estop it to sue at law on the notes evidencing the subscriptions, it is clear, we think, on this assumption, in connection with the averments in the bill

that these complainants could not proceed at law or in equity to enforce such payment over again. The subscription notes were past due when they were paid in the manner detailed in the bill. The obligation of immediate payment was then upon these respondents. It cannot be doubted, and is not questioned, that Woolfolk as president of the Terminal Company then had full power and authority to accept and it was his duty to enforce payment of these notes in money. The bill avers that they were paid in money to Woolfolk. Taking this averment, in connection with the obligation of the respondents to pay money to the company and Woolfolk's duty and authority to receive the money for the company, as meaning that the payments were made to the company, and looking also to the further averment of the bill that Woolfolk had no power or authority from the company to induce these payments by agreeing as a part of the transaction in which they were severally made to purchase the stock thus paid up from the subscribers for the company and with the assets of the company, we have the case simply of an officer of the corporation inducing payments to be made which the corporation had the absolute right to have presently made without conditions, and which it was Woolfolk's duty to coerce to be made presently and without conditions, by falsely pretending that he had authority to receive payments upon conditions which he then entered into and thereupon fulfilled and carried out by purchasing the subscribers' stock for and in the name of the company and with its assets without the shadow of authority. On the assumption upon which we are now proceeding, it is to be considered that the money thus paid to the company was legitimately used by the company in the prosecution or winding up of its business, in the payment of necessary current expenses and the debts of the corporation, and that the company and its creditors profitted so far as the money itself is concerned as fully upon the payments thus rightfully made upon illegal and unauthorized conditions as if they had been made absolutely and without such conditions. And it is not conceivable that the rightfulness and

efficaciousness of payments so made and so enuring to the benefit of the corporation and its creditors can be impeached by the circumstance that to induce them to be made the president of the company without authority from it or the semblance thereof, fraudulently and unlawfully purchased in its name the stock of these subscribers and, likewise without authority or the semblance of authority, fraudulently and unlawfully, executed bonds in the name of the company, secured by deposits of choses in action belonging to the company, or appropriated bonds belonging to the company in payment of the purchase price of such stock. So that the company and its creditors had the full benefit of these payments, and the wrong and injury which resulted from the transactions to the company and through it to its creditors is referable in no degree to the payment of their subscription notes by these respondents, nor to the cancellation of said notes, nor to the manner of such payments, but solely to the unauthorized and illegal diversion of choses in action belonging to the company in payment or to secure the payment of the price Woolfolk agreed to give for the stock. And it necessarily follows upon the construction of the bill which we have assumed for the purposes of this discussion that neither the company nor its creditors have any standing at law or in equity to enforce the payment over again of this money which has been rightfully paid to and received by the corporation and used by it in the legitimate prosecution of its business; but both the company and its creditors have, or had when this bill was filed, a remedy at law to recover its assets illegally and without corporate authorization or attempted authorization misappropriated by Woolfolk to the purchase of the shares of stock held by these respondents.

As to some of the respondents, O. C. Wiley and Wiley & Murphree, the averment of the bill is that their subscriptions and promises in writing have never been paid at all, by anybody or in any way; the allegation being in substance and almost literally that these respondents assert that they sold and transferred their stock in the Terminal Company to the defendants Sa-

portas, the latter promising and agreeing to pay said company their said subscriptions therefor and the promises in writing made for the payment thereof, that if said sales and transfers were made it was with the intent to defraud the corporation and to hinder, delay and defraud its creditors, that said respondents were amply able to pay and satisfy said debts, but were desirous to relieve themselves from liability to pay the same; and if such sales and transfers were made, they were mere contrivances by which O. C. Wiley and Wiley & Murphree sought to evade and escape from such liability, that they knew said Saportas was not a resident citizen of Alabama, and they did not believe and had no good reason to believe that he was of ability to pay for said stock, and that said subscriptions and debts of said respondents are yet due and unpaid to said company, and said company has never agreed to accept any other person as debtors in their places and stead. It is entirely clear on these facts—so clear indeed as to render discussion superfluous—that the complainants had a plain, adequate and complete remedy at law by garnishment against these respondents; and that, therefore, the bill presents no ground of equitable cognizance as to them. The complainants at one time conceived that their remedy against O. C. Wiley and the members of the firm of Wiley & Murphree was at law and summoned them in garnishment. They answered and the complainants as plaintiffs in judgment contested their answer. When that cause had taken on this status a *judgment was entered therein discharging the garnishees.* That judgment is pleaded here by said respondents in bar of the relief prayed in the bill. The plea properly presents the issue of *res adjudicata.* It is claimed for complainants that certain infirmities attach to and inhere in this judgment growing out of the circumstances under which it was taken. They are not such as will avail on collateral attack. There was no direct proceeding to vacate the judgment; and it stands unimpeached on the records of a competent court. On the averments of the present bill to which we have adverted, the plaintiffs in that cause, complainants here, were entitled to

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

judgment against the garnishee. Upon, or after the institution of a contest there judgment was passed for the garnishees. The issue in that case was necessarily indebtedness *vel non* of the garnishees to the Terminal Company. And the judgment foreclosed that issue in favor of the garnishees. That adjudication is a bar to the relief now prayed on the case made by the bill, and the plea which set it up should have been held sufficient. If there are other facts which preclude the conclusion that the issue of indebtedness was determinable in that proceeding, they are not averred in the bill; and the sufficiency of the plea is, of course, to be determined upon its averments with reference to the allegations of the bill.

LaFayette Henderson as surviving partner, etc., was a party defendant to the bill. He died February 24, 1895. J. D. Henderson was appointed his administrator May 4, 1895. An order of revivor against J. D. Henderson as such administrator was entered May 20, 1895, and notice was served on him May 27, 1895. On August 26, 1895, a decree *pro confesso* was entered against him. This was set aside and leave granted him to answer on October 8, 1895. He filed his answer on July 3, 1897, as of April 8, 1897. George B. Shellhorn, a witness for complainants, was examined orally on June 3, 1895, under an order made May 27, 1895, after Henderson had been made a party and served with notice and before the decree *pro confesso* had been entered against him and before he had answered. Interrogatories were filed to Woolfolk by complainants August 2, 1895, before answer by or decree *pro confesso* against said Henderson; he had no notice of these interrogatories. On August 26, 1895, the day on which the decree *pro confesso* was entered, a commission issued to take Woolfolk's deposition, and this commission was executed and the deposition taken on October 18, 1895, after the decree *pro confesso* against said Henderson had been set aside and before his answer was filed. La Fayette Henderson filed no answer to the bill and there was no decree *pro confesso* against him at the time of his death—none had ever been entered. The depositions of Chew and Jessup

were taken on April 17, 1896, and the depositions of J. L. Hall, Farley, Joseph, Roman and Tennille were taken in July, 1896, after the decree *pro confesso* against J. D. Henderson, administrator, etc., had been set aside and before he had answered. It is clear on the foregoing facts that the several depositions referred to were taken when the case was not at issue as to the respondent J. D. Henderson, as administrator of LaFayette Henderson, deceased, in palpable violation of rule 49 of chancery practice, which provides, with the force and effect of a statute, that "testimony cannot be taken by either party until the cause is at issue by sufficient answer or decree *pro confesso* as to all the defendants." Code, p. 1211. We do not find that the motions made by the several respondents and J. D. Henderson as such administrator to suppress these depositions were waived. To the contrary, they were insisted upon, and should have been granted.

It is averred in the bill that the judgment against the Terminal Company was recovered by one Hall, as receiver of the Farley National Bank, and that said receiver was afterwards discharged and all the assets of the bank were surrendered and delivered to it, including this judgment. This turning over of its assets including the judgment is admitted by most of the respondent, but one or more deny it, and one or more neither admit nor deny it but demand proof of the fact. Such proof was not made. In our opinion it should have been. We are inclined also to think that the transfer of this judgment by the bank to the complainants should have been proved.

There is a variance between the allegations of the original bill and the evidence as to the means used by several of the respondents in the alleged satisfaction of their subscriptions and promises in writing. The bill avers that money to the amount of the subscription notes severally was paid to Woolfolk. The evidence shows that in several instances Woolfolk accepted as payments claims which the subscribers had against the Terminal Company for brokerage and in one or more instances claims which they had against the Alabama

Midland Railway Company for services rendered to that company. This variance would have been cured by the amendment of April 8, 1897, called the "Red Ink Amendment," and that is one reason why this amendment should not have been stricken.

There appears also to be a variance between the averments and proof in respect of the date of the note executed by J. C. Henderson. The bill alleges that this note was executed March 9, *1887*. The answer of said Henderson alleges and the proof shows that it was executed March 9, 1888.

Then, too, the bill alleges that the Terminal Company was organized with an authorized capital of $100,000. The fact appears to be that at organization the capital was $250,000 and that soon afterwards it was increased to $500,000. An amendment of the bill should be made in this connection.

The cross-bill of J. M. Henderson & Co. fails to aver any facts which import a liability to them on the part of J. C. Henderson, the respondent therein. The demurrer to it was properly sustained.

The conclusions we have reached on the several questions that have been considered on the appeal of Henderson *et al.* leave the case in such condition that a discussion of its merits on the evidence would lead to no practical results, and as that we deem it more conservative of justice to render no decree here except to reverse the decree below and to remand the cause.

---

On the cross-appeal of J. L. Hall and L. B. Farley there are only two assignments of error. The first of these challenges the chancellor's action in striking the amendment referred to above as the "Red Ink Amendment" from the files. We construe that amendment to aver that in the settlement of their subscriptions and promises in writing with Woolfolk the respondents instead of paying exclusively in money as is alleged in the original bill were allowed as credits thereon claims which they asserted were due them from the Terminal Company as commissions for endorsing the company's paper and for other alleged services and also claims

33c

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

which they asserted against other corporations for services to such corporations, for which the Terminal Company was not responsible. The facts concerning the payments made by Woolfolk in the purchase of the stock subscribed for by certain of the respondents with Midland bonds, etc., belonging to the Terminal Company are sufficiently stated in the original bill, and this amendment has no reference to those transactions, and it would be superfluous had it referred to them. And assuming for the purposes of the cross-appeal that the original bill had equity to the coercion of the payment of the stock subscriptions from the respondents who had settled their notes with Woolfolk by taking credits thereon for the claims referred to asserted by them against the Terminal Company or attempted to be allowed by Woolfolk as claims against that company albeit some of them were for services rendered to other corporations, and paying the balance in money, and who as a part of the same transactions sold their stock to Woolfolk for the Terminal Company and were paid therefor with Midland bonds and other assets of said company, this amendment was proper, not alone for the purpose of curing the variance between the averments of the original bill and the proof as to how the alleged settlements were made with Woolfolk by them in respect of what Farley paid or parted with to secure the cancellation and surrender of their notes, but also for the further purpose of affording a basis for recovery against them for the amounts of such illegal credits *in addition to and cumulative upon* the collection of the amounts they had severally subscribed and promised to pay. For not having paid *money* to the full amount to secure the cancellation and surrender of their notes, but, at the same time and as a part of the same transaction, having received assets of the company equal in value to the face of the stock for which they had thus settled with Woolfolk, it is manifest that a decree against them severally for the amounts of their stock notes would not make the company or its creditors whole, but would leave it and the complainants out of pocket in each instance in the sum of the credits illegally allowed on the

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

notes for the brokerage commissions and claims against other corporations. Hence our conclusions that the amendment should have been allowed to remain in the bill both as curing the variance adverted. to and as a basis for an accounting by these respondents for a sum equal to the illegal credits allowed them by Woolfolk. And, considering the cross-appeal separately and as distinct from the original appeal, the decree striking said amendment will be reversed, and a decree will be here entered overruling and denying the motion to strike..

Therefore, on the main appeal the decree will be reversed and the cause remanded, and on the cross-appeal the decree will be reversed and a decree here rendered.

---

IN RESPONSE TO APPLICATION FOR REHEARING.

McCLELLAN, C. J.—Further investigation and consideration has but served to confirm us in the opinion that the doctrine so clearly and ably stated and declared in *Donovan v. Finn*, by Chancellor SANFORD, and which we adopted and followed in the original decision of this case, is eminently sound. All the argument that has been submitted against the integrity of that doctrine proceeds upon two utterly gratuitous assumptions: *First*, that at law, in the absence of statute, the judgment creditor has a right to have his debtor's choses in action applied to the satisfaction of his judgment, and that, therefore, since he cannot have his execution levied upon them, he may have this legal right effectuated in equity; and *second*, that the fact that choses in action are not leviable converts them into equitable property held by the judgment-debtor, that is to say, that notwithstanding the title of the owner of a chose in action is purely legal and his rights in respect of it are enforceable only in a court of law, yet it is an equitable estate or property in him, and for that reason chancery has jurisdiction over it. And it is because Chancellor SANFORD declined to adopt these assumptions, as entirely unfounded as any assumptions can be, and to be led off by these palpable sophistries that it is sought to present

him, and those "misguided" judges who recognize the
soundness of his views and conclusions, as tyros in
equity jurisprudence and ignorant of its elementary
principles. So far as Chancellor SANFORD is concerned,
his statements of legal facts and his clear and inevitable
deductions from them may well be left to stand alone
and triumphant against all such assaults. As to other
"misguided" judges it would seem to be fair to let them
speak for themselves: Among these are the Judges of
the Queen's Bench Div. of the High Court of Justice
of England, who, speaking by LINDLEY, L. J., so re-
cently as 1893, declare: "We have simply to deal with a
case in which an ordinary judgment creditor sought the
aid of a court of equity to enforce his judgment against
property not capable of being reached by any common
law process. *The only cases of this kind in which courts
of equity ever interfered* [prior to the Judicature Acts]
*were cases in which the judgment debtor had an equita-
ble interest in property which could have been reached
at law, if he had had the legal interest in it, instead of
the equitable interest only.* This will be found ex-
plained" by Jessel and Chitty and the Court of Ap-
peals (citing the cases). "It is an old mistake [and
perennial it seems] to suppose that, because there is no
effectual remedy at law, there must be one in equity.
But the mistake though old and often pointed out is
sometimes inadvertently made even now. Courts of
equity proceeded upon well known principles capable
of great expansion; but the principles themselves must
not be lost sight of. The principle on which alone the
order in this case could be supported before the Judica-
ture Acts is well explained by COTTON, L. J., in *Anglo-
Italian Bank v. Davies,* 9 Ch. D. 275; it is *that courts of
equity gave relief where legal rights existed, and there
were legal difficulties which prevented the enforcement
of that right at law.* But the existence of a legal right
is essential to the exercise of this jurisdiction. The
judgment creditor here has a legal right to be paid his
debt, but not out of the future earnings of his debtor;
and the court of chancery had no jurisdiction to pre-
vent him from earning his living or from receiving his
earnings, unless he had himself assigned or charged

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

them. The court could not restrain him from receiving them until his creditor could attach them under the process of garnishment; nor did the court ever presume to enlarge the judgment creditor's rights; nor, under colour of assisting him to enforce those rights, did the court of chancery reach by its process a kind of property which was not liable to execution. *Before debts and money were made liable to execution by statute, they could not be reached by an ordinary judgment creditor in equity any more than at law."*—Holmes v. Millage, 1 Q. B. 551, s. c. 10 Ruling Cases, 604, 608. To the same effect is the language of JESSEL, M. R.: "Prior to the Judicature Act, the courts of equity before granting equitable execution, required to be satisfied of two things, first, that the plaintiff in the action had tried all he could to get satisfaction at law; *and then that the debtor was possessed of that particular equitable interest which could not be attached at law."*—Salt v. Cooper, 16 Ch. D. 544; and to like effect are the cases of *Wills v. Luff,* 38 Ch. D. 197, and *In re Shepard,* 43 Ch. D. 131. And this has for time out of mind been the law of England. Lord THURLOW, in *Dundas v. Dutens,* 1 Vesey, Jr., 196-7, the contention being that the chancery court should give execution against shares of corporation stock, said: "Is there any case where a man having stock in his own name has been sued for the purpose of having it applied to satisfy creditors? Those things, such as stock, debts, being choses in action, are not liable. They could not be taken upon a *levari facias.* * * * I have never heard of such a thing." Chancellor THURLOW may have been a "misleader of youth;" but if so it is a strange thing indeed that none of the learned judges of England from his day to this has discovered the fact, but to the contrary, they all have uniformly followed, reaffirmed and redeclared the doctrine of *Dundas v. Dutens,* believing in their simple souls that it was the law of the land. Nor was the proposition stated by Lord THURLOW a *dictum* in that case according either to the apprehension of all subsequent English judges, or to the fact. It is singular to say the least that neither the fact of what Lord THURLOW said being a *dictum,* nor

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

the fact of his obtuseness and ignorance should have been discovered until now, and has not even yet been realized by any English judge, or American for that matter. Of his declaration of the law in the case referred to, Lord Chancellor MANNERS, in *M'Carthy v. Goold,* 1 B. & B. 178-9, has this to say: "The claim upon dividends of bank stock has been very properly abandoned. I listened very attentively to Lord THURLOW in the case of *Dundas v. Dutens,* which was heard upon decree, and not upon motion, and he was clearly of opinion that *choses in action,* of which description is stock, could not be reached by the process of this court." The same judge in *Grogan v. Cooke,* 2 B. & B. 115, said further: "In the case of *Dundas v. Dutens,* the question was whether stock that had been settled could be brought within the reach of creditors; I have a note of that case which, on this point, is more full than the printed report of it, which I will briefly state. Lord THURLOW says: 'Is there any case where stock standing in a trustee's name can be made available to pay debts, or that debts (and stock is a *chose in action*) shall be transferred to creditors for that purpose? You cannot have an execution at law against such effects.' So in this case, how could the creditors have made their policies of insurance available, either at law or in equity during Cooke's life? for independent of the objection that a *chose in action* is neither subject to an execution, or to be attached in equity by creditors in the lifetime of the debtor, here Cooke himself could recover nothing upon those policies." Lord ELDON, a chancellor of some repute in his time, referred upon occasion to Lord THURLOW with respect and deference, and held with him that *choses in action* were not leviable, and could not be subjected in equity to the satisfaction of a judgment at law, (*Nantes v. Corrock,* 9 Ves. Jr. 182, 188; *Rider v. Kidder,* 10 Ves. Jr. 360, 368), remarking in the latter case: "It is clear, stock cannot be attached in the life of a party. Such was the language of Lord THURLOW in *Dundas v. Dutens;* and also in the case of *Sir Alexander Leith,* where a bill was filed to try whether this court would give execution in aid of the infirmity of the law; and it was held that there was no jurisdiction."

So it stands the law in England to-day, apart from recent statutes, and has always been the law there, that a judgment creditor had *no right* to subject the debtor's *choses in action* to the satisfaction of his judgment, and that there being no such primal legal right, the court of chancery has not, and has never had, any power or jurisdiction to subject such property to the judgment at law. In addition to the American courts and judges who hold the same doctrine referred to in the original opinion, the judges of the courts of last resort in the States of Maryland, New Jersey, Tennessee, and Kentucky, are, according to counsel for appellees youngsters who have been misled by Chancellor SANFORD and Lord THURLOW along with all the great judges of England.

The Maryland Court of Appeals, on December 3d, 1896, in an elaborate opinion reviewing all the authorities laid down the doctrine declared by the English courts and by Chancellor SANFORD, concluding the discussion with this quotation from *Donovan v. Finn*: "When a creditor comes into this court for relief, he must come, not merely to obtain a decree or satisfaction of a judgment, but he must present facts which form a case for equity jurisdiction." In the course of the opinion, the court says: "In the early cases in England the jurisdiction here contended for, to subject choses in action to the claim of creditors by a creditor's bill, was sustained, but generally upon the ground of fraud, trust, or for some other reason which it was conceded would entitle the creditor to invoke its aid. Thus *Taylor v. Jones*, 2 Atk. 600, lays down the doctrine that where a debtor has in fraud of his creditors assigned to trustees certain *choses in action* in trust for himself for life, and then over to his wife and children, a Court of Equity will favorably hear the application of such creditors, and decree such trust estate to be sold for the payment of their debts. And this was held to be so, notwithstanding such *choses in action* were not subject to levy and sale upon execution at law.—*Rex v. Marisal*, 3 Atk. 192; *Edgell v. Haywood*, 3 Atk. 352; *Horn v. Horn*, Ambl. 79; *Partridge v. Gopp*, Ambl. 578; *Smither v. Lewis*, 1 Vern. 398. But even in cases like that of *Taylor v.*

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

*Jones, supra,* and the others just cited, which would perhaps be now generally conceded to be within the limits of equity jurisdiction because of the allegation and proof of fraud, it was subsequently held in England that creditors could get no relief in equity because they had no legal right which equity could enforce.—*Dundas v. Dutens,* 1 Ves. Jr. 196; *Grogan v. Grogan,* 2 Ball & Beatty, 210. In the case last cited Lord MANNERS quoted Lord THURLOW as having said: 'The opinion in *Horn v. Horn* is so anomalous and unfounded that forty such opinions would not satisfy me. It would be preposterous and absurd to set aside an agreement, which if set aside leaves the stock in the name of the person where you could not touch it.' And in *Bayard v. Hoffman,* 4 Johnson Ch. 450, Chancellor KENT, after a most careful and elaborate examination of the English authorities, came to the conclusion that while Lord HARDWICKE had maintained the jurisdiction of equity thus to proceed against *choses in action,* it was afterwards denied and overthrown by both Lord THURLOW and Lord ELDON, although his own opinion as expressed in *Bayard v. Hoffmann, supra,* was that 'the better reason is with the earlier authorities.' But, notwithstanding this expression of opinion in the case just cited, the more recent cases upon this point in New York and some other States have vigorously announced and maintained the doctrine that aside from statute, and in the absence of fraud or some element of trust, chancery has no jurisdiction to subject *choses in action* to the payment of creditors, because there happens to be no remedy at law, and it would seem that Chancellor himself had adopted this view, as will appear by reference to his commentaries, vol. 4, page 61, where he refers to the New York statute as authority for the statement that in that State a *chose in action* may be reached by process in chancery for the benefit of creditors."

In the Maryland case it was suggested and insisted, as it is in this, that the creditor's remedy by attachment of the person of the debtor having been abolished, the jurisdiction of equity to reach *choses in action* at once came into existence as a necessary complement to im-

perfect legal remedies. This position the court repudiated in the following terms: "Nor do we assent to the view that the mere abolition of the extraordinary remedies of outlawry and attachment of the person would confer jurisdiction on equity. Such a conclusion would be in conflict with reason, as well as with modern authority. It would not seem to follow that if the law had always and consistently refused to give an execution against things in action, and had allowed only the extraordinary remedies just mentioned, that upon the destruction of the latter, the former would not only thereupon spring into existence, but become remedies appropriate for a Court of Equity. The contrary conclusion would, we think, be more reasonable, namely, that the Legislature having abolished execution against the person which was used for the purpose of getting satisfaction out of the debtor's effects which could not be reached by other executions, and having failed to provide any new remedy to take its place it was not intended there should be any. And so it has been held in *Donovan v. Finn,* 1 Hopkins Ch. Rep. 59 (N. Y.); *Buford v. Buford,* 1 Bibb, 305; *Greene v. Keene,* 14 R. I. 387, 397. 'Equity follows the law,' and as we have seen, a rule either of statute or common law is as potent in a Court of Equity as in a Court of Law. 1 Story Eq. Jur., § 64. Whatever may, at one time, have been the vague and general rule as to the limits and extent of equity jurisdiction, it is now well settled that 'no Court of Chancery at this day would attempt to supply the defects of law by deciding contrary to its settled rules in any manner, to any extent, or under any circumstances, beyond the already settled principles of equity jurisprudence.' 1 Pomeroy Eq. Jurisp., section 47."

The whole of this able and learned opinion might be set out here with advantage to the bench and bar of the State; but we content ourselves with the following additional excerpt: "It would seem to be reasonably clear from the authorities already cited and the discussion of them that, in the absence of a statute and in the absence of fraud or some other ground of equity juris-

diction, a Court of Equity has no power to subject the defendant's unassigned right of dower to the payment of her debts. But this conclusion will, we think, be placed beyond doubt by a brief consideration of some of the adjudications of the highest courts of other States. In the case of *Maxom v. Gray,* 14 R. I. 641, which was decided in 1885, the very question now before us was passed upon. That case, like this, was a bill in equity by judgment creditors for a decree for a sale of an unassigned right of dower, and in an able and elaborate opinion the court came to the conclusion, after reviewing many of the previous cases, that equity had no jurisdiction. To the same effect *Greene v. Keene, Ib.* 388. In *Creswell v. Smith,* 2 Tenn. Ch. 416, it was held that chancery has no power to reach stocks or things in action, even in the hands of third persons unaffected with fraud or trust without the aid of a statute.—*Keightly v. Walls,* 27 Ind. 384; *Williams v. Reynolds,* 7 Ind. 622. In the case last cited it is said equity will not subject choses in action to the payment of a judgment creditor, because equity only aids the law, and will, therefore, not interfere, except as to such property as may be sold on execution at law. In the case of *Buford v. Buford, supra,* the same view was enforced in the absence of a statute, and in concluding its opinion the court said, 'The bare circumstance of a debt cannot be made the foundation of a bill.' The views upon the question of jurisdiction expressed in all these cases are in accord with the rule as laid down by Mr. Adams. 'Equity,' he says, 'does not create new rights which the common law denies, but it gives effective redress for the infringement of existing rights, where by reason of the special circumstances of the case redress at law is inadequate.'—Adams Equity, p. 6; Phelps Juridicial Equity, sec. 158."

This case is published in 57 Am. St. Rep. 407, and in a note Mr. Freeman again cites *Donovan v. Finn,* and several other cases, and says: "There is probably a preponderance of authority in favor of the view that equity has no power in ordinary cases to compel the appropriation of choses in action to the payment of

their owner's debts." *Harper et al. v. Clayton,* 84 Md. 346, 355.

The Supreme Court of Tennessee is equally pronounced in support of the doctrine of the original opinion in this case. The following is the opinion of that court in the first case which came before it involving this question: "This is a bill filed by the complainant to subject stock in the Nashville Bridge Company to the payment of his debt due from the defendant. It is not pretended that there is any fraud or trust in this case to furnish a ground of equity jurisdiction; and the simple question is, whether this court has power to cause stocks, credits and rights of action held by a debtor, without fraud, to be sold or converted into money, or transferred to the creditor in payment of his debt; we think it has not: and without entering into any reasoning on the subject, or review of authorities, we refer as conclusively settling the point to the case of *Donovan v. Finn,* 1 Hop. Rep. 59. Our act of assembly of 1833, ch. 11, makes ample provision upon this subject; but this bill being filed long before the passage of that act, cannot be governed by it. Affirm the decree."—*Erwin v. Olham,* 6 Yerger, 185.

In the case of *Creswell v. Smith,* 8 Lea, 688, which was decided nearly fifty years later, the decision in *Erwin v. Oldham,* was reaffirmed by the Supreme Court of Tennessee; and it was further held "that the mere abolishment of imprisonment for debt would not, without more, vest the chancery court with jurisdiction it did not previously possess, however much the creditor might need additional aid." This case was heard in the first instance and decided by Chancellor COOPER, a judge of very high repute with most lawyers and jurists, and in a learned opinion reviewing all the authorities and reaching the conclusion that equity was without jurisdiction in the premises, is found a reference to Lord HARDWICKE'S position on the question which is peculiarly opposite here in view of the argument of counsel. After referring to the courts and judges ranging themselves on either side of the question, he continues: "In this war of giants,*'non mi tantas componere lites.'* If, how-

ever, to the great names of KENT and WALWORTH could be added the greater name of Lord HARDWICKE, it would be difficult to convince a lawyer of the present day that the weight of reason was not with them, whatever might be the weight of authority. Unfortunately for that side of the question, we have a positive decision of the master mind of English equity, which seems to have been overlooked by Chancellor KENT, and is directly in accord with *Donovan v. Finn.* In both cases a judgment creditor after exhausting his legal remedy, sought to reach a legacy due to the debtor in the hands of the executor of the decedent, and in both the decision, so far as it turned upon the inherent power of the court of chancery, was the same." The chancellor then reviews the rulings of Lord HARDWICKE in *Edgell v. Haywood,* 3 Atk. 352, and continues: "The language of this decision against the power of the chancery court to reach stock, debts and choses in action, not leviable by execution, is quite as emphatic as that of Lord THURLOW in *Dundas v. Dutens.* It was only by virtue of the statute that the court could act. *Donovan v. Finn* was precisely the same case without the statute. I conclude, therefore, that this eminent judge was of the same opinion as his successors—that such property could not be reached directly in equity, but only through some other ground of jurisdiction, such as fraud or trust."—*Creswell v. Smith,* 2 Tenn. Ch. 416, 422-3.

In the original opinion we cited some Kentucky cases supporting the conclusion reached. We will now advert to one or two others decided by the court of last resort of that State. *Buford v. Buford,* 1 Bibb, 305, is one of them. We copy from the opinion in that case: "The point being settled, that at *law* the obligation which James Buford held on Calloway, could not have been taken in execution, nor the land in the said bond described, it remains to enquire if a court of equity can go beyond the law, and create a new right. Equity cannot construe a statute otherwise than a court of law can. Both courts are bound by the same rules of construction, insomuch it is a maxim that *'equitas sequitur legem.'* Equity will remove impediments which are in

the way to legal rights; and will give redress where according to the forms of procedure at law, the complainant might have a right without a remedy, or where that remedy would be incomplete. Equity will enforce a recognized right, in a manner unattainable at law, but it cannot create a right unknown to the law. What right then had William Buford, upon which he could bottom his complaint in chancery? At law he could have no lien upon his debtor's property, by virtue of his judgment, until his writ of execution was delivered to the proper officer; but even after delivery he could have gained no *lien* thereby on the *land* or the *bond* which is the subject of the complaint. The application therefore is not to enforce a *right* recognized by law, but to *create one* and give a *lien* unknown to the law. Equity cannot sustain the prayer of the creditor upon the suggestion that his debtor has but an individual piece of property, and that his debt must remain unpaid unless the law shall be transcended and that property made liable. If the chancellor is not circumscribed by the rules of law which enter into and constitute the right, what is to limit his discretion? If he can seize the bare circumstance of a debt as the foundation of the bill, and create a *privity* or a *lien*, where the law has given none, then indeed it might be said that justice was to be measured by the chancellor's foot, his power by his *appetite,* and his range illimitable. A bond for land gives no vested right to the *land.* It is but a right to ask for the subject or damages by way of compensation for not complying with that right. It is but a chose in action, which *execution* cannot reach, and which equity cannot reach in behalf of a creditor, without a privity created by the parties or by the *law.* The insolvency of the debtor can furnish no ground for the interposition of the chancellor, when in so doing he does not follow, but outgoes the law. As well might the creditor ask that his debtor who was destitute of property, should be compelled to labor and suffer the creditor to receive the proceeds. And yet it is believed the chancellor could exercise no such power, although the law had given the creditor an execution

against the body of the debtor." And in the late case of *Curd v. Letcher*, 3 J. J. Mar. the same court reaffirms the doctrine of *Buford v. Buford*, and of the other cases cited in our original opinion.

The New Jersey court, enjoying an especially high reputation in the field of equity jurisprudence, is thoroughly committed to the same doctrine. The first case was that of *Disborough v. Outcalt*, 1 Saxton's Ch. 298. There was a full discussion of the question on principle and authority, and an unqualified acceptance and adoption of the doctrine of *Donovan v. Finn*. In *Whitney v. Robbins*, 17 N. J. Eq., 360, it is decided that "the jurisdiction of the court of chancery to collect the choses in action of a judgment debtor, and apply them to the payment of his debts, has never been assumed in this State until conferred by the acts of" 1845 and 1864, and this holding was reaffirmed in *Vanderveer v. Stryker*, 4 Hals. Ch. 175. The case of *Hardenburgh v. Blair*, 30 N. J. Eq. 645, was decided by the Court of Errors and Appeals in 1879. The court having held that the relief sought was not grantable under certain statutes of that State, proceeds thus: "But it is contended, on behalf of the judgment creditor, that, independently of the acts of 1845 and 1864, chancery had a jurisdiction which would enable it to reach the moneys in question and apply them in payment of the judgment debt of the *cestui que trust*. An examination of the decisions of the English courts will show it to be there settled that an original jurisdiction of this kind did not pertain to its courts of equity. The powers of the court were simply in aid of the judgment creditor, where a trust had been interposed which obstructed the operation of the process of a court of law, and extended only to such property as, save for the interposition of the legal obstacle, might have been reached by such process. Speaking on this subject, Lord COTTENHAM says: 'What gives a judgment creditor a right against the estate is only the act of parliament, for, independently of that, he has no such right. The act of parliament gives him, if he pleases, the option by the writ of *elegit*. * * * The effect of the proceeding under the writ, is to give the

creditor a legal title, which, if no impediment prevent
him, he may enforce at law by ejectment. If there be
a legal impediment, he then comes into the court, not to
obtain a greater benefit than the law (that is, the act
of parliament) has given him, but to have the same
benefit which he would have had at law if no legal
impediment had intervened.' *Neate v. Duke of Marl-
borough,* 3 Myl. & Cr. 416. Mr. Lewin, after an ex-
amination of the cases, uses this language: 'As equity
only follows, and does not enlarge the law, the judg-
ment creditor has no title to relief where the chattel,'
of which the trust has been created, is not, in itself,
amenable to any legal process.' Lewin on Trusts, 648.
In *Taylor v. Jones,* 2 Atk. 600, which Chancellor KENT
said contained the great and leading doctrine in sup-
port of the creditor, the debtor had, in fraud of creditors,
purchased stock with his own money, and vested it in
trustees for the benefit of himself for life, and of his
wife for her life, and afterwards for the benefit of his
children. On a bill filed by his creditors to have his
debts paid out of the stock, it was decreed that the trust
estate be sold and applied in payment of the creditors,
although the stock was not, at that time, subject to
levy and sale under execution at law. The case was one
infected with fraud, and the decision of the master of
rolls was put on that ground. Now, although fraud is
one of the heads of equity jurisdiction, yet *Taylor v.
Jones,* and several other cases of the same kind, have
been denied as contrary to correct principle, by a weight
of judicial opinion that entirely destroys their value as
precedents.—Lewin on Trusts, 648. The subject has
since been regulated by acts of parliament, which ex-
pressly make a judgment debtor's equitable interest in
lands, and also stock, funds, and annuities held by him
in his own name, or in the name of another in trust for
him, available for the payment of his debts.    *   *   *
*   *   Independently of these statutes, and the statutes
relating to insolvent debtors and bankrupts, it is well
settled in England, at the present time, that the jurisdic-
tion of chancery in aid of a judgment creditor extends
no further than to property of such a nature and de-

scription as might have been seized by the process at law if some legal obstacle had not been interposed."

Recurring now to the New York decisions: The case of *Hadden v. Spader,* 20 Johns Ch. 554, is chiefly relied upon as settling the doctrine in that State that a judgmen creditor even in the absence of statute may come into chancery to have satisfaction out of choses in action belonging to his debtor. There is an opinion in that case by WOODWORTH, J., to this effect. It was concurred in by SPENCER, C. J., and dissented from by PLATT, J. The statement of facts in the report demonstrates that the case was one of fraud and trust and therefore, well within a recognized head of equity jurisdiction wholly apart from the question we are now upon. All which is made entirely clear in the opinion delivered by Justice PLATT, who concurred in the affirmance of the decree upon the ground of fraud and trust, concluding in these words: "But I am not prepared to extend this doctrine to any other cases than those wherein the trustee received goods *liable in themselves to execution.* under circumstances which imply fraud, in fact or in law, as against creditors. In an abstract view, it may appear proper to extend the remedy in favor of creditors, to every *chose in action* of the debtor. But in my judgment such power has not yet been conferred on our courts of justice; and it will be the appropriate office of a bankrupt law, or some other legislative provision, to afford such a remedy. I feel that we are treading on new ground, and I am unwilling to commit myself beyond the case now before us." What we have thus set forth as being the case before the court, leads inevitably to the conclusion that all that was declared by WOODWORTH, J., as to the right of a creditor to subject the choses in action of his debtor was beside the case presented, wholly unnecessary to its decision, and therefore was the merest *dicta* of that judge. It was so declared in the subsequent case of *Donovan v. Finn,* as we have seen; it was so considered and esteemed by the lawmakers of New York, else there would have been no occasion for the statute of 1830, expressly passed to "settle" the law in accordance with WOODWORTH'S opinion, and

so expressly held by the Court for the Correction of Errors in the case of *Durant v. Albany County*, 26 Wend, 66, decided in 1841. And, beyond this, the opinion is inconsistent with itself, in that it confesses in one part that the remedy proposed to be applied must be predicated upon a *right existing at law*, but which in the particular case the remedy at law is inadequate to effectuate, and from this sound basis stated in the opinion itself, it proceeds to the conclusion that equity may reach and apply choses in action when confessedly there was no right at law in any case to so reach and apply them. In the case last cited—*Durant v. Albany County*—the decision was that the chancery court had no such jurisdiction as was attempted to be declared by Justice WOODWORTH in *Hadden v. Spader*, and the presiding judge of the court in delivering the ruling opinion in the case had the following among other things to say of *Hadden v. Spader*: "It is true in the case of *Hadden and Spader*, the learned member of the court of errors, who delivered the leading opinion, did advance a doctrine which carried the jurisdiction of chancery beyond its former recognized limits, and extended it to the discovery and application of choses in action and equitable interests, which could not before be levied upon by execution at law. In these views another learned member of the court expressly concurred; and what is very remarkable, the opinion which had been delivered, is expressly referred to in the preamble to the final decree entered in the case. But this case, I apprehend, notwithstanding the extraordinary preamble of the decree, cannot be considered as deciding anything beyond the true point involved in the case. That was clearly within the former acknowledged jurisdiction of the court of chancery. It was in no respect necessary, therefore, to *its* decision and the affirmance of the decree of the chancellor, to assert the new and enlarged jurisdiction of that court, which was claimed for it in the leading opinion delivered on the final decision of the case. While, therefore, that decision has been considered as sound law, the reasoning of the leading opinion in it appears not to have been received with equal

favor, or to have been acquiesced in either by the courts or the bar." Here follows quotations from the opinion of Chancellor SANFORD in *Donovan v. Finn,* showing the unsoundness of WOODWORTH'S *views* in *Hadden v. Spader,* which we do not repeat here as they are set out in the original opinion; and the opinion in *Durant's* case proceeds: "I have been the more liberal in my quotations from the opinion of Chancellor SANFORD in the case of *Donovan and Finn,* not only because that case appears to have been fully argued, and well and ably considered, but because they present the views of a chancellor, who was as faithful and enlightened in the exercise of the powers which he believed himself to possess, as he was careful to abstain from the assumption of those not within his proper jurisdiction; and who, while he was prompt to apply all the legitimate and beneficient prerogatives of equity to the great purposes of justice, viewed with anxiety, and not without painful alarm, the tendency of his own court to an undue accumulation and exercise of powers. Few officers of the court of chancery have lived, whose governing principle appears to contrast more strikingly with that embraced in the old saying, so fully exemplified in the life and character of Cardinal Wolsey, the chancellor of Henry VIII. of England: *'That great men in judicial places will never want authority.'* Views of the case of *Hadden and Spader,* similar to those of Chancellor SANFORD, seem to have been entertained by Justice MARCY and others, in the subsequent case of *Pettit v. Candler,* in this court in 1829. See 3 Wendell, 618. Justice MARCY there says: 'The relief asked for and granted in the case of *Hadden v. Spader,* lay within the uncontested powers of the court; but the doctrine advanced by some of the judges when that case was reviewed in this court, went greatly beyond the principle necessarily involved in it, and is supposed by Chancellor SANFORD not to have the sanction of the court.' 'Nothing can be certainly said to be established as law by this court in a particular decision, but what is necessarily involved in the case decided.' Chief Justice SAVAGE concurred in the views presented by Justice MARCY, with the remark, that 'his

impressions were that, under the existing law, a defendant is not bound to answer as to property which never was within the reach of an execution.' Justice SUTHERLAND concurred, reserving himself upon this latter point. I think, therefore, that it must be conceded that the law of the decision in the case of *Hadden and Spader* did not extend the jurisdiction of chancery beyond its former acknowledged limits; and that, previous to the statute of 1830, that court, in the absence of fraud, trust, or other head of equity, had no power to compel the discovery of money, stocks, choses in action, or equitable interests of a debtor, not tangible by execution at law; and to apply them, when discovered, to the payment of the debt of a creditor, even although such creditor had obtained a judgment at law, issued an execution thereon, and had it returned unsatisfied. If the court had such jurisdiction already, then the passage of the statute of 1830, expressly giving it that jurisdiction, was unnecessary and is without effect. But I take the passage of that statute to be evidence that, in the opinion of the revisers who proposed it, and the revising legislature who passed it, the court of chancery independent of the statute, had not the jurisdiction in question. Indeed, the revisers in presenting the draft, of the proposed statute, expressly say, that 'deeming it important to settle the law, and preserve the rule as laid down in *Hadden and Spader*, they have prepared the above sections;' thereby clearly implying that without them, the law was not so settled." It was insisted in *Durant's* case, as it is insisted here, that the statute of New York above referred to was merely declaratory of, "and only reasserted jurisdiction which the court of chancery already possessed, but which had been drawn into question and doubt," and there as here certain declarations of Chancellor WALWORTH were relied upon to support the position. Of these deliverances the opinion in *Durant's* case treats as follows: "I am aware that in *Tarbell v. Griggs*, 5 Paige 207, the present Chancellor—WALWORTH—said, '*It has been repeatedly decided* that this section of the Revised Statutes is not introductory of a new principle, but is only in affirmance of what was considered

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

by the court of dernier resort, the legitimate jurisdiction of the court of chancery previous to the adoption of the Revised Statutes.' The learned chancellor has not been pleased to refer us to the cases in which it has been *so repeatedly decided.* The statute went into effect in 1830; the chancellor spoke in 1882, and I am not aware of any decision of any court during that period, or even down to the present time, giving to the statute in question the character and effect ascribed to it by the chancellor. If there be any such decision I have been unable to find it. It is true that in *Child v. Brace,* 4 Paige, 309, the chancellor again says, 'It must be recollected, however, that this statute is only declaratory of a principle which had before been adopted in this court.' Again, the chancellor does not refer us to the cases in which the principle of the statute had been adopted in our court of chancery; and I know of no case in which that principle forms a part of the decree and law of the case." After referring to all the cases at all bearing on the matter and demonstrating that none of them supports Chancellor WALWORTH's assertion, the opinion, with reference to him, proceeds: "Down to 1827, it would appear that, in the opinion of the present Chancellor himself, notwithstanding the decision in the case of *Hadden v. Spader,* neither the doctrine of the leading opinion in that case, nor the principle of the statute of 1830 was the acknowledged law of the court of chancery of this State; for in the case of *Weed and Martin v. Pierce,* which in that year came before him, as Vice-Chancellor of the fourth judicial circuit, he said, 'I think with the late Chancellor, that in an ordinary case, free from all fraud and justice, this court ought not, on the application of an execution creditor, to deprive the debtor of the power of collecting his debts. There must undoubtedly be an unconscientious exercise of that power on the part of the debtor, or some fraud, collusion, injustice, or wilful neglect on his part to collect and apply his debts and choses to satisfy his creditors; or some other ground of equitable jurisdiction in relation to such debts or choses in action, to enable execution creditors, by aid of a court of equity, to reach and apply

the same in satisfaction of their judgments and executions. It must be admitted that the reasoning of Judge WOODWORTH' (in *Hadden and Spader*) 'would extend the jurisdiction of courts of equity much beyond what the late Chancellor supposed was allowable.' Such were the views of Vice-Chancellor WALWORTH in 1827. They seem to me to be entirely sound, and to present truly the law of the court of chancery down to 1830." This very able and exhaustive opinion in another part undertakes to summarize the law of New York on the question under consideration, prior to the statute of 1830: "The ordinary cases in which a court of chancery in the exercise of its appropriate powers, and within its own proper and legitimate jurisdiction, might, previous to 1830, interfere in aid of a judgment creditor, may be comprised under the two general classes following: 1. To compel the discovery of property improperly concealed, or withdrawn from the creditor; and which, when discovered, may be taken in execution at law; and 2. To remove impediments, either created by equity, or interposed by fraud, to the due course of proceedings at law. It is believed that, previous to the Revised Statutes of 1830, the cases in which our own court of chancery interfered to relieve judgment creditors, were all embraced in these two general classes, and were, of course, all cases of acknowledged equity jurisdiction. They all came under some general head of equity. The case of *Bayard v. Hoffman,* 4 Johns. Ch. 450, was a case of fraud, trust, and a conveyance without consideration; that of *Brinckerhoff v. Brown,* Id. 671, was a case of fraud; that of *McDermot v. Strong,* Id. 687, was a case of trust; that of *Hadden v. Spader,* 5 John. Ch. 280, and 20 John. 554, was a case of trust and fraud; and the case of *Pettit v. Candler,* 3 Wend. 618, was also one of trust and fraud. These are the leading cases in our own courts previous to 1830; and it will be seen on examination that they all embrace some general head of equity, and are thus within the legitimate jurisdiction of chancery. In neither of them was there an attempt on the part of the court, without facts or incidents of equitable jurisdiction, to discover and apply to

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

the payment of the debt of a judgment creditor, stocks, credits, choses in action of equitable interests, not tangible by execution at law."

We will not pursue this discussion and citation of authority further. Quite enough has been said and shown upon adjudged cases and texts incidentally quoted to demonstrate that "*Donovan v. Finn* was" *not* "opposed to the precedents extant from the most distinguished judges," but was strictly declaratory of the law of England and of the State of New York in the then absence of statutes. Enough has appeared also to demonstrate that "*Donovan v. Finn* was" *not* "immediately denounced, disregarded and overruled," and that it *has been* "followed in the State of New York where it originated." And apart from these statements, quite sufficient of reason and authority has been presented to demonstrate the soundness of the proposition of *Donovan v. Finn* as a living principle today. On the other hand, the case of *Hadden v. Spader*, or rather the view of Justice WOODWORTH there evpressed, is a conclusion drawn from a stated premise which palpably and according to all well considered cases does not support it; was at most a *dictum* wholly unnecessary to the determination of the case, and has been denounced, disregarded and overruled, not only in New York where it originated, but also by courts, whose learning and ability have not before now been drawn in question, almost from one end of this country to the other.

But it is insisted that this court in its early reports— in cases arising before we had any statutes bearing on the matter—ruled in line with the views of Justice WOODWORTH expressed in *Hadden v. Spader*, and against the doctrine declared in *Donovan v. Finn;* and counsel, for the first time, on the application for rehearing, cite some Alabama cases. Among them is *Brown et al. v. Bates*, 10 Ala. 432. This was a case under the statute of 1844 (to be considered further on), but in the course of his opinion in the case Chief Justice COLLIER remarked: "It was held in this State long previous to 1844, that a judgment creditor who had exhausted his legal remedies might go into equity for the purpose of

subjecting the equitable estate of his debtor, or other interests that could not be made available at law." But the learned Chief Justice does not cite any case in support of this *dictum* of his, and none have been cited by counsel or found by us. The only cases prior to *Brown v. Bates* to which we have been referred are those of *Vandegraaf v. Medlock,* 3 Porter, 389; *Morgan v. Crabb,* Id. 470; *Roper v. Cook,* 7 Ala. 318; and *Lyon v. Bolling,* 9 Ala. 463. The last named case was simply a bill filed by a creditor by subrogation to subject to the payment of his debt land which had been purchased and paid for by the debtor, but the title to which, in fraud of complainant and other creditors, had been taken in the name of the debtor's son. There could have been nothing decided in such a case bearing upon the matter of consideration, and nothing was attempted to be decided nor was anything *said* having any such bearing. The 7th Ala. case was a bill filed by the assignee of a purchase money note to enforce a vendor's lien. After deciding that the bill had equity to enforce the lien, COLLIER, C. J., *said* that if complainant *had not had* a lien, he *should have had* to recover judgment and have execution returned *nulla bona,* before he could have come into equity to subject the equitable estate of his debtor, meaning by "equitable estate" property belonging to the debtor but standing in the name of another person, there having been no conveyance executed to the debtor in the case. In the the case of *Vandegraaf v. Medlock,* 3 Porter, 389, the case and the decision are embodied in this head-note: "Chancery has no power to decree to mortgagees, the proceeds of a policy of insurance, effected by the mortgagor, on the mortgaged property, where the same has been destoyed by fire—no covenant existing in the deed as to the insurance." Clearly here was nothing bearing on our point. But Judge HOPKINS said wholly outside of the case and the decision: "If he [the mortgagor] be insolvent, his other creditors have as just a claim to the proceeds of the policy as the mortgagee. But no creditor could make them liable by the aid of a court of equity, to satisfy his demand, who had not before he filed his bill for the purpose, obtained

a judgment at law, sued out execution, and pursued the latter to every available extent at law," and he cites in support of this obvious *dictum Brinckerhoff v. Brown,* 4 Johns. Ch. 671, which does not support it in point of *decision,* and which so far as its *dicta* may tend that way has been wholly repudiated. But leaving *Brinckerhoff v. Brown* out of the question, the casual and incidental remark of Judge HOPKINS amounts to nothing, and even as *dictum* it does not support the *dictum* of Judge COLLIER in *Brown v. Bates,* quoted above. It is only necessary to say of the case of *Morgan v. Crabb,* 3 Porter, 470, that the *dictum* of Judge HOPKINS just referred to is there repeated by him, and is confessedly as alien to the case and the decision in the one case as in the other. It is most manifest that these *dicta* do not support Judge COLLIER's *dictum* in *Brown v. Bates*: "It was held in this State long previous to 1844," etc., etc.; and that they did not by any means establish any doctrine in this State opposed to *Donovan v. Finn* prior to the act of the year just named.

We may interject here that as the territorial legislature had, in 1818, passed a garnishment statute, it might well have been decided by this court prior to the act of 1844 that chancery would entertain a bill to reach the choses in action of a judgment debtor *which because of some legal impediment* could not be reached and subjected by process of garnishment; but this, as we shall see, would have been on the ground that the statute referred to had given the judgment creditor the *legal right* to subject choses in action, and the legal remedy was inadequate under the particular circumstances.

Therefore, we include Alabama in repeating and reaffirming the doctrine of the original opinion that, apart from statutes, courts of equity have not and never had any power or jurisdiction to subject the choses in action of a debtor to the satisfaction of a judgment against him.

There is a statute in Alabama which, it is insisted, confers this power and jurisdiction in cases of the kind we have in hand. This was enacted in 1844; that part of it now relied on by appellees was embodied in a

changed form as section 2987 of the Code of 1852, was section 3540 of the Code of 1886 when this case arose, and is section 814 of the Code of 1896. We are of opinion that this statute has no bearing on the case in hand, for the reason that it authorizes bills for *discovery* only, and the subjection of property *discovered* in proceedings under bills for *discovery* and nothing else, and the bill in this case is in no sense a bill for discovery, or within the statute at all. The statute in its original form was as follows: "An Act authorizing the filing of Bills in Chancery in certain cases. Section 1. *Be it enacted,*" etc., "That whenever an execution against the property of a defendant shall have been issued on a judgment at law and shall have been returned unsatisfied, and there shall remain due on said judgment, the party suing out such execution may file a bill in chancery against such defendant, and any other person or persons, to compel the discovery of any property, money, or thing in action, belonging to the defendant, and if [of] any property, money, or thing in action due to him or held in trust for him, and to prevent the transfer of any such property, money, or thing in action, or the payment or delivery thereof to the defendant, except when such trust has been created by, or the fund so held in trust, has proceeded from some other person than the defendant himself. Sec. 2. *And be it further enacted,* That the said court shall have power to compel such discovery, and to prevent such transfer, and to decree satisfaction of the sum remaining due on such judgment, out of any property, money, or thing in action belonging to the defendant, or held in trust for him, with the exception above noted, which shall be discovered by the proceedings in chancery, whether the same were originally liable to execution at law or not. Sec. 3. *And be it further enacted,* That a bill of discovery may be filed, and the defendant shall be compelled to answer such bill, when the defendant is charged with having confessed, or suffered any judgment purporting to be for a sum or debt due, when in fact nothing, or, only a part of the sum stated in said judgment is due, with intent to defraud the just creditors of said defendant, or to place

the property of the defendant out of the reach of his
creditors or to hold the same on some secret trust or
confidence, or for the benefit of such defendant." Acts
1844, pp. 107-8. It is manifest that we need refer in
this discussion only to the first and second sections of
this act, the third, being entirely alien to the present
case, is not involved. So much of sections 1 and 2 of
this act as was the law when this bill was filed was em-
bodied in section 2987 of the Code of 1852 taken in con-
nection with section 2 of that Code, and so it has been
embodied in each subsequent Code without amendment
and constitutes section 814 of the Code of 1896, with cer-
tain provisions of section 2 of that Code read into it.
As codified in 1852 the statute reads as rollows: "§
2987. When an execution for money from any court
has been issued against a defendant, and it is not satis-
fied, the plaintiff or the person for whose benefit such
execution is sued out, may file a bill in chancery against
such defendant, to compel the discovery of any property
belonging to him, or held in trust for him; and to pre-
vent the transfer, payment, or delivery thereof to such
defendant, except when the trust has been created by or
proceeded from some other person than the defendant
himself; and the court may bring any other party be-
fore it, and decree such property, or the interest of the
defendant therein, to the satisfaction of the sum due
plaintiff." The words, "or money, or thing in action"
employed several times following the word "property"
in the original statute are not set down in this section,
but they are supplied by the definition of the word
"property" as used in the Code contained in section 2
of this and all succeeding Codes, so that in this respect
the codified statute is precisely the same as the original.
Another difference between the original act and its codi-
fication consists of the omission from the latter of the
provision of the former for the bill to be filed against
"any other person or persons" as well as against the
defendant in execution. Whatever else may be said of
this omission, it is certainly not supplied by any provis-
ion, in any of the Codes, unless the provisions in these
words: "and the court may bring any other party before

it," etc. which was not in the statute originally, but is
new to the Code of 1852, be taken to supply in a sense
the omission last referred to. Doubtless the new pro-
vision does in a sense supply the old, or the occasion
rather for the old; but it cannot be said that they are
the same or.mean the same thing. To the contrary, the
original statute proceeds upon the theory that persons
having property of, or owing money to the defendant
*may be known to the complainant* at the time he files a
bill to discover them, and being known it undertook to
authorize the bill to be *filed,* the suit initiated against
them as well as against the defendant in the first in-
stance. On the other hand, the codifiers, taking the stat-
ute to authorize what only it purports to authorize,
namely, the filing of a bill of *discovery* and the subjec-
tion of property *discovered* under it to complainant's
judgment at law, and recognizing, what the legislature
had apparently overlooked, the sheer anomaly, and to
say absurdity, of prosecuting a bill to *discover* property
of the defendant which complainant already knows to
be in the hands of or due the defendant from a known
person, and recognizing also the existence in Alabama
since before its admission into the Union of a garnish-
ment statute, which they themselves had incorporated
in previous sections of the Code of 1852, by which all
the effects of the defendant in the hands of or owing by
third persons known to the judgment creditor could be
reached and subjected at law, and hence that there was
no possible occasion for a bill in equity in that behalf,
they, the codifiers, in making this change, proceeded
upon the only true theory of a bill of discovery, that is
to say, the theory that the complainants could not know
before filing his bill and having it answered who held
defendant's concealed property or might not know who
owed defendant money, and provided, instead of al-
lowing the bill to be filed against other persons, that
when such other persons should be *discovered* by the
answer to the bill, the court should then bring them
before it and sequester the effects of defendant in their
hands or owing by them. The change thus wrought by
the codifiers is a pregnant one. It is quite true that

the original statute in terms authorized the filing of a bill *of discovery*, and expressly limited the remedy given to property "which shall be *discovered* by the proceedings in chancery;" yet so long as the provision authorizing the bill to be filed against third persons remained, there was such inconsistency in the act as gave rise to plausible contention that a bill not of discovery could be maintained under it; and to this may be ascribed whatever of *dicta* this court may have at any time indulged to that effect: The important change in question has not been at all times sufficiently taken into account. With it properly in view there is, and, since the Code of 1852, there has been no room whatever, nor the least justification for saying that under the statute any other than a bill of discovery can be filed.

To the query, Why give this remedy against unknown or concealed property and not against known property of the defendant? the answer is short, complete and perfectly manifest. It is, as we have already indicated, that, in 1844 when this act was passed, and in 1852 when it was codified, the judgment creditor already had and for years had had a plain and adequate remedy at law by garnishment to reach and subject to his judgment all known property, money and choses in action belonging to the defendant held in trust or otherwise by, or owing from third persons, under the Territorial act of 1818 which was embodied in the Code of 1852 as section 2471, and which has continued to be the law of this State.—Aiken's Ala. Dig. 213. It is the converse question, so to speak, Why should the legislature have given a remedy by bill in chancery to subject *known* effects of the judgment debtor when there was already a plain, adequate and complete remedy in that regard at law?' which cannot be answered at all; and upon which the only thing that can be said is that no remedy by bill in equity to reach such known effects has ever been given or attempted to be given. And it was to remove any semblance of haziness even upon this point that the codifiers of 1852 made the change in the act of 1844 to which we have adverted. John J. ORMOND, the chief codifier of 1852, was on this bench along with

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

COLLIER, C. J. and GOLDTHWAITE, J., when *Brown v. Bates*, 10 Ala. 432, was decided. He was also on the bench with the same associates, when the case of *Allen et al. v. Montgomery Railroad Co. et al.*, 11 Ala. 437, was decided; and in this latter case it was held that a bill seeking to subject choses in action which could be reached by garnishment was without equity, and it was this doctrine which he and his co-commissioners sought to relieve from all questions by more clearly and distinctly confining the remedy given by the act of 1844 to property which could not be reached by garnishment because it was concealed, and in respect of which, therefore, a discovery was necessary.

But it is insisted that the statute of 1844 was taken from and is substantially the same as the New York statute of 1830, that that statute has been construed by the courts of New York to authorize the judgment creditor to file a bill in chancery to reach and subject the choses in action of the debtor in any case whether discovery is necessary or not, and that, of consequence, our statutes should receive the same interpretation. The statute of New York is a substantial prototype of the act of 1844, except that it contains no provision for making others than the judgment debtor defendants to the bill it authorizes; and it differs from the codification of the act of 1844 in that it does not provide for the court's bringing in persons who are discovered by the answer to owe money to or have effects of the debtor defendant. It was, however, expressly enacted with reference and settled the law according to the opinion of WOODWORTH in *Hadden v. Spader*, in which the bill made another than and along with the debtor a party defendant, and this circumstance probably justifies the construction there put on the statute in this regard. It is probably a circumstance, too, tending to give plausibility to the notion that because the statute of 1844 authorized others than the defendant in judgment to be made respondents to the bill, such bill need not be strictly one for discovery, but it is a circumstance of no importance in the construction of the codification of the act of 1844, which strikes out the provision for making third persons par-

ties, and provides for the bill being filed against the judgment debtor and the *bringing in by order of the court* third persons whom the answer discovers to be in possession of the respondent's property or to owe him money. This pregnant change in the statute of 1844 in itself supplies good ground for not applying to it as codified the construction which in this regard was applied to the New York statute. But there are cogent grounds for repudiating the New York construction as the sound one as well for the act of 1844 as for its codification. As we have said the statute of that State was enacted expressly to establish as law the view of Justice WOODWORTH in *Hadden v. Spader*. That view was in effect that whenever execution on a judgment at law should be returned *nulla bona,* the judgment creditor had a right to come into equity to reach and subject to the satisfaction of his judgment choses in action belonging to the judgment debtor. The expressed purpose on the part of the lawmakers to settle this declaration of Justice WOODWORTH as the law of the State, naturally, and, it may be conceded, properly overbore and emasculated expressions in the body of the act confining the remedy to cases in which discovery was necessary and to bills for discovery. There was no expression on the part of the legislature of Alabama in the passage of the act of 1844 of any purpose beyond that set forth in the body of the act itself; and looking to the act itself there can be no question, we think, that the thing authorized was the filing of *bills of discovery* only, and not the filing of bills generally to reach choses in action of the judgment debtor. In other words, the consideration which constrained the New York courts to disregard the terms of the act itself which went to confine it to bills of discovery, never had any existence in respect of the courts of Alabama; and leaving it out of view, the conclusion that our statute has reference solely to such bills cannot be reasonably escaped. But there is yet another view which to our minds in itself strips the contention for the application of the New York construction to the Alabama statute of all semblance of merit: The deliverance of Justice WOODWORTH is expressly rested on the

theory that the choses in action of a debtor should be applied to the satisfaction of the judgment against him, that there was no way to so subject them at law and that *ex necessitate* equity must supply the remedy to that end. It was not pretended that equity would give such remedy if there was a remedy at law; but his position was that chancery would eke out the deficiencies of the law because it was absolutely necessary to the ends of justice that it should do so. He merely proposed to apply a remedy to meet a necessity, and the doctrine he enunciated went, nor was intended to go, no whit beyond the necessity. This doctrine of necessity was that the legislature of New York expressly proposed to settle as the law of the State. At that time there was no remedy at law in that State to reach and subject any of the judgment debtor's choses in action known or concealed. There was no statute of garnishment nor other mode of levy at law upon choses in action. To carry into effect the remedy of WOODWORTH, J., as he had formulated it, which formulation the legislature expressly undertook to make the law of the State, it was necessary for the statute to be construed to give a remedy in equity against all choses in action, because at law there was no remedy against any. If there had been a garnishment law in New York under which all known choses in action of the debtor could have been subjected at law, the proposition of Justice WOODWORTH would not have involved an equity remedy to subject them, and the statute to settle his proposition as law could not have been construed to extend the equity remedy to them. The whole purpose of WOODWORTH, J., which was expressly declared to be the purpose of the legislature, being to give a remedy against choses in action which could not be reached, and because they could not be reached at law, the statute could never have been construed to give a remedy in equity against choses in action which could be reached at law, more especially when such a construction would have done palpable violence to the language of the body of the act dissociated from the otherwise expressed purpose of its enactment. Now in Alabama in the year 1844 the only choses in

action of a judgment debtor which could not be reached and applied to the satisfaction of the judgment by legal process, were those which were concealed from the judgment creditor; there was no lack of legal remedy to apply these once found, but only a want of power in the courts of law and in the creditor to find them; the doctrine of necessity applied to them only to the extent of supplying a remedy to *discover* them, to discover in whose hands they were or who owed money to the defendant in judgment. To this end the statute is express: it authorizes the filing of a bill of *discovery*, and not any other sort of bill; it deals with property *discovered* in the proceedings consequent upon the bill for *discovery,* and it deals with no other property; and by the same judges who decided *Brown v. Bates,* 10 Ala. 432, it was decided in *Allen et al. v. Montgomery Railroad Co. et al.* 11 Ala. 437, and this after the statute of 1844 and immediately after it had been treated and discussed by them, that the chancery court had no jurisdiction to subject a chose in action which was leviable by process of garnishment in a court of law. The statute of New York was intended to meet a necessity, and it was construed to be commensurate with that necessity. The Alabama statute was intended to meet a necessity, and it was in effect construed in the last case cited to be commensurate with that necessity. In New York the necessity covered all choses in action, and in violence to the language of the body of the enactment it was held to give a remedy to subject all choses in action. In Alabama the necessity was only as to those choses in action which were concealed or unknown; the terms of the enactment do not embrace any others: every consideration pertinent to the interpretation and construction of the statute drives unerringly and inevitably to the conclusion that it does not and never did authorize anything whatever but bills of discovery and proceedings under bills of discovery to subject the property discovered; and *Allen's* case, *supra,* is to all intents and purposes a decision to that effect. So much for the insistence that the construction placed by the courts of that State on the New York statute should be adopted by our courts with reference to our statute.

[Henderson *et al.* v. Hall *et al.*, and Hall *et al.* v. Henderson *et al.*]

But it is further insisted that the New York construction *has been* applied by this court to this statute. Two cases are mainly relied on in this connection. They are *Brown v. Bates* 10 Ala. 432, and *Martin v. Carter*, 90 Ala. 96. *Brown v. Bates* was decided before the change was made in the statute by the codifiers, but that change is not of importance to that case. That bill was strictly one within the provisions of the statute as we have construed it, and purely for the discovery of concealed property and its subjection when discovered to the satisfaction of the complainants' judgment. It was filed against the judgment debtor and against nobody else. It alleged among other things that defendant had choses in action and other property which were so secreted and concealed that process of law could not reach them. It did not aver, but to the contrary showed ignorance in respect of, the names of third persons having property of or owing money to the defendant, and sought to discover these persons. It was held to be well filed, and its averments to be sufficient under the act of 1844. It was simply an impossibility for the court in that case to have construed the statute to authorize any other bill in equity to subject choses in action than a bill to *discover* choses in action and to subject the choses discovered in the proceedings to the judgment. And we by no means understand that any effort was made in that direction. Had it been made in the opinion, it would have been the mere *saying* of Judge COLLIER, not the adjudication of the court and of no efficacy for any purpose. That nothing of the sort was intended is shown by the ruling of the same judges at the succeeding term of the court that no bill in equity would lie to reach choses in action leviable by garnishment at law.—*Allen's case, supra*.

In *Martin v. Carter*, 90 Ala. 96, Judge CLOPTON said: "Under the statute [the reference being to the statute we have been considering, then constituting section 3540 of the Code of 1886], a bill may be filed to subject property which cannot be sold under execution, or reached by legal process, or for discovery in aid of the execution at law." He cites no authority for this broad proposition except *Brown v. Bates*, which, as we have

35c

seen, does not so decide. The bill sought to subject to the claim of the complainant the interest of Martin, one of the respondents, in two notes executed by Wells & Moore to Martin and six other persons jointly, and to foreclose a mortgage given by the makers of the notes to the payees to secure the payment thereof. While assuming that the bill is filed under the statute, the decision is rested on the grounds that the interest of Martin in the mortgaged property could not be levied on, and that his interest in the notes could not be reached and subjected by process of garnishment, because that would be a splitting up of the cause of action against the makers of the notes. Now this was a correct decision, and the only proper grounds to put it upon wholly apart from the statute. As held and illustrated in many of the cases which we have collated, this case presented a state of facts upon which on all the authorities relief in equity could be had without reference to the act of 1844. It was simply a case of a right given at law which because of a legal impediment could not be effectuated by legal process. As we have seen, long before the act of 1844, a statute of this State gave to a judgment creditor the right to subject the choses in action of the debtor to the satisfaction of the judgment. There was before that time also a statute authorizing attachments to be levied upon choses in action of the defendant in attachment by process of garnishment. Both these statutes have been of force ever since their enactment in 1818. But for the legal impediment referred to, the interest of Martin in the notes given to him and others by Wells & Moore was leviable by process of garnishment at law. The interest belonged to a class of property against which the judgment creditor was given a right to proceed by legal process. But in this particular instance he could not so proceed because the makers of the notes could not be forced at law to pay one of the joint payees leaving themselves subject to other suits by the other payees, and the judgment creditor of one of the payees, having no claim against the others, could not coerce the payment of the full amount of the notes. Here there was a right given at law, a legal impediment to its enforcement at

law, and an appeal to chancery to effectuate the right because though given by the law, the law courts could not effectuate it. And chancery jurisdiction is always properly invoked in such cases on the principle elaborated by Chancellor SANFORD and other courts and judges from whom we have quoted in the course of this opinion, and thus tersely stated by Lord LINDLEY: "Courts of equity [before the statute] gave relief where a legal right existed, and there were legal difficulties which prevented the enforcement of that right at law."— *Holmes v. Millage,* 10 Ruling Cases; 608. So that all that was said by Judge CLOPTON in *Martin v. Carter* as to the statute was but the merest *dicta,* outside of the case, and unsound as *dicta;* and the decision was properly rested on considerations which gave the bill equity and authorized the relief prayed without any reference to the statute. What Judge CLOPTON thus mistakenly and unnecessarily said is of no more importance or effect as a construction of the statute than had it been said in a casual conversation.

The case of *Nix v. Winter,* 35 Ala. 309, is also cited in support of the application for rehearing. Nothing was involved or decided or even said in that case bearing upon the construction of the statute in the respect under consideration. *Brown v. Bates* is there cited to the point that it was not indispensable for a bill under the statute to aver that the execution was issued to the county of the debtor's residence and returned *"nulla bona,"* and from this it may be inferred that the court assumed that that bill was filed under the statute. If so, the assumption was entirely gratuitous and erroneous. The bill was filed to subject an equitable interest in land and thus invoked the exercise of jurisdiction which courts of chancery have independent of statute, the well established doctrine being that equity power may be appealed to to subject the debtor's equitable interest in property "which could have been reached at law, if he had had the legal interest in it instead of an equitable interest only."—*Holmes v. Millage, supra.*

It is said that Chief Justice·BRICKELL, in *Ex parte John Hardy,* 68 Ala. 303, 323 *et seq.,* expressed views at

war with the conclusion we reach as to the original jurisdiction of equity and the construction of the statute of 1844. But the opinion of Judge BRICKELL in that case was the *dissenting,* not the ruling opinion, and it was, therefore, impotent to put a construction on the statute or to settle what the law was before its enactment. What he did say was merely argumentative and incidental in support of his position in the case, and would have been *dicta* even had his been the governing opinion. Among other things, however, he did say : "The whole scope of the statute, as is evident from its most casual reading, is to authorize creditors, who have exhausted remedies at law, to resort to a court of equity for the discovery of property subject to the payment of their debts; and when discovered, its subjection for that purpose by the decree and process of the court. * * * When the principle is established that every species of property, legal or equitable, tangible or intangible, in which a debtor has a beneficial right or interest, not exempt by law, is bound for, and may be reached and applied to the satisfaction of his debts, if legal remedies fail, as they are indisputably shown to have failed, when there is a judgment at law, followed by a fruitless return of the process for its execution, the power of a court of equity must be perfectly adequate to carry the principle into effect, unless with humiliation we confess, that there are legal and equitable wrongs for which there is no remedy." After setting this down as the predicate for what was to follow, what he further said at war with our conclusion, was equally at war and inconsistent with the propositions thus made the bases of his argument. In the ruling opinion in *Ex parte Hardy,* which was delivered by Judge SOMERVILLE, no views in opposition to our position are expressed, but on the contrary in a general way we are supported.

We have examined every other Alabama case, it is believed, at all bearing upon either of the questions we have been discussing, and every case in which *Brown v. Bates* is cited; and we find in none of them anything to stand in the way of either of the conclusions we have reached; namely, *first,* that in the absence of statutes

[State *ex rel.* Turner v. Bradley *et al.*]

the chancery court has no jurisdiction to reach and subject choses in action of a judgment debtor to the satisfaction of the judgment; *second,* that the statute of 1844 confers that jurisdiction only in respect of concealed choses in action to be exercised only by bill of discovery and proceedings thereunder; and, *third,* that a judgment creditor having under the garnishment statute the legal right to levy upon choses in action of his debtor, may come into equity to effectuate that legal right when because of some impediment it cannot be enforced by garnishment.

This bill is obviously not under the statute as we construe the statute and as the statute plainly reads. There is no impediment to the enforcement of the complainants' judgment by garnishment at law, and the case it presents is not otherwise cognizable in equity apart from statutes.

The importance of this case in principle, and, to the parties in amounts involved, and the ability, learning and industry displayed by counsel upon either hand in its presentation go somewhat in justification of the length of this opinion.

Let the application for rehearing be overruled.